Jane Kay DUKOWITZ, Appellant,

v.

HANNON SECURITY SERVICES,
Respondent.

No. A11–1481.

Supreme Court of Minnesota.

Jan. 2, 2014.

John J. Neal, Willenbring, Dahl, Wocken & Zimmermann, PLLC, Cold Spring, MN, for appellant.

James R. Andreen, Jessica A. Ommen, Erstad & Riemer, P.A., Minneapolis, MN, for respondent.

Leslie L. Lienemann, Culberth & Lienemann, LLP, Saint Paul, MN; Stephen L. Smith, The Law Firm of Stephen L. Smith, Dorene R. Sarnoski, Dorene R. Sarnoski Law Office; and Justin D. Cummins, Cummins & Cummins, LLP, Minneapolis, MN, for amicus curiae National Employment Lawyers Association, Minnesota Chapter.

## OPINION

STRAS, Justice.

Respondent Hannon Security Services ("Hannon") terminated appellant Jane Kay Dukowitz from her position as a security officer. In this appeal, Dukowitz presents two legal questions for our consideration. The first question is whether the public-policy exception to the employment-at-will rule applies to a termination resulting from an employee's application for unemployment benefits. The second question is whether a district court has discretion to consider a non-prevailing party's status as an indigent litigant when it awards costs and disbursements to a prevailing party in a civil action. Because we conclude that the public-policy exception to the employment-at-will rule does not apply in this case and that Minn.Stat. § 549.04, subd. 1 (2012), does not permit a court to consider a non-prevailing party's indigent status, we affirm.

### I.

Hannon hired Dukowitz as a security officer in November 2005 and assigned her to an evening position. In July 2008, Du-

kowitz learned about a temporary daytime position that would be available for the holiday season. Dukowitz's supervisor offered her the position, but required Dukowitz to sign a document acknowledging the possibility that the position would be unavailable beyond the holiday season. Dukowitz switched to the daytime position in September 2008. In early December, Dukowitz's supervisor informed her that the position would no longer be available after the end of December and that Hannon did not have any hours available for Dukowitz in the ensuing months. Dukowitz claims that she told her direct supervisor that she would need to apply for unemployment benefits "to make ends meet." According to Dukowitz, her supervisor then turned to another supervisor and asked, "should we term her?"—in other words, terminate her employment. Dukowitz claims that she begged her supervisor not to terminate her and asked that Hannon place her on a "floating shift" so that she could work when shifts became available.

Dukowitz applied for unemployment benefits on December 21, 2008. Two days later, Dukowitz's daytime position became unavailable. Hannon ultimately terminated Dukowitz's employment on March 13, 2009. The parties dispute the reasons for Dukowitz's termination. Hannon asserts that Dukowitz was terminated because of her "poor work [for a client], her expressed unwillingness to work weekends or nights and the lack of Hannon opportunities for business in the St. Cloud area." Dukowitz contends that she received positive performance reviews and that she never refused to work weekends or nights.

In June 2010, Dukowitz commenced this action against Hannon for wrongful discharge. Dukowitz alleged in her complaint that Hannon violated the public policy of the State of Minnesota when it terminated her employment in retaliation for her application for unemployment benefits. The district court granted Hannon's motion for summary judgment based in part on its conclusion that "common law wrongful termination claims [are limited] to scenarios in which an employee was fired for his or her refusal to violate the law."[1] The court also awarded Hannon $1,361.35 in costs and disbursements, rejecting Dukowitz's argument that the court should not award Hannon costs and disbursements because of her indigent status.

The court of appeals affirmed. *Dukowitz v. Hannon Sec. Servs.*, 815 N.W.2d 848, 855 (Minn.App.2012). The court acknowledged that "an employer may be liable for wrongful discharge if it terminates an employment relationship because of the employee's refusal to violate the law," but concluded that Dukowitz's claim did "not come within this narrow exception" to the employment-at-will rule. *Id.* at 851. Instead, the court observed that allowing Dukowitz to proceed on her theory would

---

1. We disagree with Dukowitz's characterization of the district court's order as one for judgment on the pleadings. In granting judgment to Hannon, the court considered matters outside the pleadings, including affidavits and other exhibits, which by rule converted Hannon's motion into one for summary judgment. *See* Minn. R. Civ. P. 12.02 ("If ... matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...."); *N. States Power Co. v. Minn. Met-* *ro. Council*, 684 N.W.2d 485, 491 (Minn.2004) (applying the summary-judgment standard to a motion for judgment on the pleadings when the district court considered matters outside the pleadings in granting judgment to one of the parties). Moreover, although the court used the caption "judgment on the pleadings" in its order granting judgment to Hannon, the order also states that "the defendant's motion for summary judgment is granted" and explicitly references and applies the standard for summary judgment.

require it "to recognize a new cause of action." *Id.* The court of appeals also concluded that the district court "correctly determined that it did not have discretion to deny Hannon's application for costs and disbursements." *Id.* at 855. We granted Dukowitz's petition for further review.[2]

## II.

■ The first question presented in this case is whether the public-policy exception to the employment-at-will rule applies to a termination resulting from an employee's application for unemployment benefits. We review de novo a district court's grant of summary judgment. *Savela v. City of Duluth,* 806 N.W.2d 793, 796 (Minn.2011). We view the evidence in the light most favorable to the party against whom summary judgment was granted to determine whether there are any genuine issues of material fact and whether the district court correctly applied the law. *Bearder v. State,* 806 N.W.2d 766, 770 (Minn.2011).

The dispute in this case centers on the scope of the public-policy exception to the employment-at-will rule. Dukowitz argues that our decisions in *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569 (Minn. 1987), and *Nelson v. Productive Alternatives, Inc.,* 715 N.W.2d 452 (Minn.2006), establish a cause of action for wrongful discharge if an employee can identify a clear mandate of public policy that the employer violated when it discharged the employee. Dukowitz alternatively asserts that, even if the scope of the public-policy exception is more limited, we should now recognize a cause of action for wrongful discharge under the circumstances presented by this case. We address each of Dukowitz's arguments in turn.

## A.

■ In Minnesota, the employer-employee relationship is generally at-will, which means that an employer may discharge an employee for "any reason or no reason" and that an employee is "under no obligation to remain on the job." *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983). In *Phipps,* we recognized a narrow public-policy exception to the employment-at-will rule. *See* 408 N.W.2d at 571. We held that "[a]n employee may bring an action for wrongful discharge if that employee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law." *Id.* We thus limited the cause of action in *Phipps* to discharges resulting from an employee's good-faith refusal to violate the law.

Dukowitz interprets *Phipps* more broadly, arguing that the case implicitly recognized an exception to the employment-at-will rule for any violation of a clear mandate of the state's public policy. Dukowitz's interpretation, however, is inconsistent with the reasoning of *Phipps.* In that case, we did not reach "the policy question of whether or not Minnesota should join the three-fifths of the states that now recognize, to some extent, a cause of action for wrongful discharge." *Phipps,* 408 N.W.2d at 571; *see also Anderson–Johanningmeier v. Mid–Minn. Women's Ctr., Inc.,* 637 N.W.2d 270, 273 (Minn.2002)

---

2. The court of appeals also held that Minnesota's unemployment-insurance statutes do not create an implied private right of action for wrongful discharge. *See Dukowitz,* 815 N.W.2d at 852–54. However, Dukowitz did not raise that issue in her petition for further review, and we therefore decline to address it. *See State v. Koppi,* 798 N.W.2d 358, 366 (Minn.2011) (indicating that we do not generally review issues that are not raised in a petition for further review).

(noting that *Phipps* "did not resolve whether Minnesota should join the majority of states that had recognized a cause of action for wrongful discharge").

*Nelson*, the other case relied upon by Dukowitz, was similarly limited in scope. In *Nelson*, we considered the effect of Minnesota's Whistleblower Act, Minn.Stat. § 181.931–.935 (2012), on the cause of action we had recognized in *Phipps*. *Nelson*, 715 N.W.2d at 453. Although we acknowledged some possible overlap between the two, we held that the common-law cause of action that we had recognized in *Phipps* survived the enactment of the Whistleblower Act. *See Nelson*, 715 N.W.2d at 455 & n. 3.

Of particular significance here, we also concluded that Nelson's complaint failed to state a legally cognizable claim. *Id.* at 456. In doing so, we observed that Nelson had failed to identify a "clear public policy at stake that would justify judicially interposing a new restriction and a new cause of action." *Id.* at 457. We then explicitly declined to consider whether the public-policy exception extended to circumstances beyond those identified in *Phipps*:

> Because we conclude that Nelson's discharge was not a violation of a clear public policy, we need not determine whether Nelson would have stated a viable cause of action for wrongful discharge if his discharge *had* violated a clear public policy. Accordingly, we also do not address the broader question of whether other discharges in violation of public policy give rise to common-law causes of action, aside from those that we already recognized in *Phipps*.

*See Nelson*, 715 N.W.2d at 457 n. 5.

*Phipps* and *Nelson*, therefore, recognize a common-law cause of action for wrongful discharge only in those circumstances in which a termination is the result of an employee's refusal to do an act that the employee, in good faith, believes to be illegal. *See Abraham v. Cnty. of Hennepin*, 639 N.W.2d 342, 352 (Minn.2002) (stating that "the common law protects those fired for their refusal to violate the law"); *Anderson–Johanningmeier*, 637 N.W.2d at 273 (same). Neither case recognizes a broader cause of action that arises every time an employee's termination results from an employer's violation of a clear mandate of public policy. Because Dukowitz has not alleged that her termination resulted from a refusal to commit an act that she, in good faith, believed to be illegal, she has not stated a cause of action under *Phipps* or *Nelson*.

### B.

■ In light of the limited scope of *Phipps* and *Nelson*, Dukowitz's claim survives only if we recognize a new cause of action for wrongful discharge for terminations resulting from an employee's application for unemployment benefits. We decline to do so for two reasons.

First, as we observed in *Nelson*, this court "has generally been reluctant to undertake the task of determining public policy since this role is usually better performed by the legislature." 715 N.W.2d at 457 n. 5; *see also Mattson v. Flynn*, 216 Minn. 354, 363, 13 N.W.2d 11, 16 (1944) ("The public policy of a state is for the legislature to determine and not the courts."). Although phrased broadly, the statement in *Nelson* reflects our general reluctance to expand a purely legislative statement of public policy by recognizing a new cause of action without any indication that the Legislature intends for us to do so. In *Haskin v. Northeast Airways, Inc.*, for example, we addressed whether an airplane passenger injured in a crash caused by the negligence of the pilot had a cause of action against the airplane's owner, who had authorized the pilot to use the air-

plane. 266 Minn. 210, 211, 123 N.W.2d 81, 82 (1963). After reviewing several provisions of the Uniform Aeronautics Act, we concluded that the passenger could not sue the owner of the airplane under the statute, which had expressly incorporated the common-law rules applicable to torts occurring on land. *Id.* at 211–12, 123 N.W.2d at 83. In addressing whether to expand the common law to recognize a new cause of action, we stated that it was for the Legislature to determine whether "[t]he strong considerations of public policy ... would justify a change in the law." *Id.* at 216, 123 N.W.2d at 86.

Our general reluctance to extend the legislatively declared public policy of the state applies with equal, if not greater, force here. Significantly, Dukowitz's argument requires us to depart from the traditional American common-law, employment-at-will rule. The employment-at-will rule—foundational in American employment law for well over a century—protects the freedom of the employer and employee to contract. *See Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919, 920 (1987) ("The original purposes of the employment at-will doctrine were to afford employees the freedom to contract to suit their needs and to allow employers to exercise their best judgment with regard to employment matters."). Dukowitz does not provide us with a persuasive reason to depart from the common law.

Moreover, neither Dukowitz nor the dissent can delineate the contours of the tort that they urge us to adopt, which presumably would make an employer liable whenever a court can identify a clear statement of public policy that the employer has violated by discharging an employee. Essentially, the dissent's support for the expansion of the tort boils down to its view that "[a] common-law wrongful-discharge claim

... would advance [Minnesota's] public policy by fostering additional deterrence" of employers who decline to follow the requirements of Minnesota's unemployment-compensation statutes. The dissent's bare assertion about deterrence provides no guidance for how to identify clear statements of public policy. Neither does the dissent's invocation of the unemployment-compensation statute's statement of purpose and other remedies limit the tort it would adopt. After all, "all laws implicate some public policy," *State v. Stone,* 572 N.W.2d 725, 730 (Minn.1997), and we can hardly enunciate a rule that says that we know an actionable public-policy violation when we see it, *cf. Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

Indeed, given the difficulties of defining a clear statement of public policy, it is not surprising that even those states that have adopted a public-policy exception to at-will employment have disagreed on the parameters of the cause of action. *See generally Green v. Ralee Eng'g Co.,* 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046, 1052 (1998) (observing that "public policy as a concept is notoriously resistant to precise definition" (citation omitted) (internal quotation marks omitted)); Dan B. Dobbs et al., *The Law of Torts* §§ 704–05 (2d ed.2011) (explaining that "some courts have limited the [public-policy exception] to specific factual categories such as whistleblowers and retaliation for claiming workers' compensation rights," while other courts permit public policy to "derive from constitutions or statutes or from administrative regulations," and still other courts have found public policies independent of any specific law). The variation and lack of precision in the articulation of the exception reflect legitimate disagreement about how to identify and weigh the many interests at stake in employer-employee relationships.

These considerations reinforce our hesitation, which we have identified in *Nelson* and elsewhere, to declare the public policy of the state in employer-employee relationships, particularly when the Legislature has spoken and the rule advocated by the dissent would constitute a fundamental departure from the common-law, employment-at-will rule. *See Nelson,* 715 N.W.2d at 457 n. 5; *see also Anderson–Johanningmeier,* 637 N.W.2d at 277–78 (Blatz, C.J., concurring) (expressing doubt about the judiciary's ability to determine "what employers' decisions contravene a clear mandate of public policy" (citation omitted) (internal quotation marks omitted)); *State ex rel. Meehan v. Empie,* 164 Minn. 14, 17, 204 N.W. 572, 573–74 (1925) ("Courts do not determine public policy when the legislature speaks."). The Legislature, through the legislative process, is equipped to balance the competing interests of employers, employees, and the public to determine whether, and when, an employer violates the public policy of the state by discharging an employee. *See Stawikowski v. Collins Elec. Constr. Co.,* 289 N.W.2d 390, 395 (Minn.1979) ("Although we believe that the equities favor nondisqualification of [applicants for unemployment insurance] in cases such as this, we do well to exercise judicial restraint in deference to the legislature's superior ability to deal with broad social and economic policy issues of this nature."). Here, the Legislature has made such a determination, and it is not for us to extend the public policy that it has declared.[3]

Second, we decline to expand the public-policy exception to the employment-at-will rule when the Legislature has already delineated the consequences for an employer that interferes with an employee's application for unemployment benefits. Under Minn.Stat. § 268.192, subd. 1 (2012), an employer who "directly or *indirectly* ... obstruct[s] or impede[s] an application or continued request for unemployment benefits" is guilty of a misdemeanor. (Emphasis added.) Moreover, Minn.Stat. § 268.184 (2012), provides an extensive scheme of administrative and criminal penalties for an employer's misconduct related to the administration of the unemployment-insurance program.

As numerous courts have recognized, adoption of a new cause of action is particularly inappropriate when the Legislature has already provided other remedies to vindicate the public policy of the state. *See, e.g., Ross v. Stouffer Hotel Co. (Haw.) Ltd.,* 76 Hawai'i 454, 879 P.2d 1037, 1047 (1994) ("[W]e think it is both unnecessary and unwise to permit a judicially created cause of action, which is designed to promote a specific public policy in a narrow class of cases, to be maintained where the policy sought to be vindicated is already embodied in a statute providing its own remedy for its violation." (citation omitted) (internal quotation marks omitted)); *Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 773 N.E.2d 526, 531 (2002) ("Simply put,

---

**3.** The dissent implies that we are somehow waiting for the Legislature's "permission" to develop the common law. The dissent mischaracterizes our point. We agree that it is the responsibility of courts to develop the common law. *See Lake v. Wal–Mart Stores, Inc.,* 582 N.W.2d 231, 233 (Minn.1998). Our point is far narrower: once the Legislature declares public policy through legislation, we are especially reluctant to extend the legisla-

tively declared public policy by creating a cause of action that is nowhere to be found in the legislation. *Cf. Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 760 (Minn.2010) ("If the legislature fails to address a particular topic, our rules of construction forbid adding words or meaning to a statute that are purposely omitted or inadvertently overlooked." (citation omitted) (internal quotation marks omitted)).

there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests."); *Collier v. Insignia Fin. Grp.*, 981 P.2d 321, 323 (Okla.1999) (recognizing that a public-policy exception to at-will employment is available only when "there is no adequate, statutorily-expressed remedy"). Under these circumstances, principles of judicial restraint reinforce our decision not to create a new remedy when the Legislature has already provided for one. *Becker v. Mayo Found.*, 737 N.W.2d 200, 207 (Minn. 2007) (observing that " 'where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it' " (quoting *Transamerica Mort. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979))).

The dissent argues that our reasoning is inconsistent with *Nelson*, but then fails to acknowledge that *Nelson* involved the opposite situation from the one presented here. In *Nelson*, we answered the question of whether Minnesota's Whistleblower Act had superseded the common-law rule from *Phipps*. In answering that question in the negative, we recognized that the Whistleblower Act created a statutory remedy without abrogating the common-law cause of action for wrongful discharge. *Nelson*, 715 N.W.2d at 455. Our holding was consistent with the general rule that the Legislature abrogates the common law only by express wording or necessary implication, *see U.S. Bank, N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 380

(Minn.2011), both of which we concluded were absent in *Nelson*. *See Nelson*, 715 N.W.2d at 455. Here, by contrast, expansion of the public-policy exception to the employment-at-will rule would require us to curtail the common-law, employment-at-will rule and create a remedy beyond the one that the Legislature has already provided. Far from drawing support from *Nelson*, the dissent's analysis turns the reasoning of *Nelson* on its head.

In reaching our decision today, we emphasize that the Legislature has not created a civil action for retaliation in Minnesota's unemployment-insurance statutes. In contrast, the Legislature has explicitly furnished a civil remedy for retaliation in a variety of analogous situations, including when an employer discharges an employee for seeking workers' compensation benefits or for reporting an employer's violation of state or federal law.[4] *See* Minn.Stat. §§ 176.82, subd. 1 (2012) ("Any person discharging . . . an employee for seeking workers' compensation benefits . . . is liable in a civil action . . . ."), 181.932, subd. 1 (prohibiting retaliation against an employee who, in good faith, "reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official"). Recognition of a new common-law cause of action under these circumstances runs the risk of upsetting the careful balance adopted by the Legislature in the heavily regulated area of unemployment insurance.

---

4. As the dissent notes, other states have applied the public-policy exception to situations in which an employer terminates an employee for seeking workers' compensation benefits. In Minnesota, however, the Legislature has provided a cause of action in precisely that situation. Minn.Stat. § .82, subd. 1 (2012). The Legislature's policy choice to create a civil cause of action for one group of employees (those discharged for seeking workers'

compensation benefits), but not another (those discharged for seeking unemployment benefits), supports our decision not to expand the public-policy exception in this case. *See In re Hubbard*, 778 N.W.2d 313, 323 (Minn. 2010) (noting that the Legislature's action in one statute but inaction in another shows that the Legislature "knows how" to accomplish a particular objective if it wishes to do so).

Accordingly, we decline Dukowitz's invitation to expand the scope of the public-policy exception to the employment-at-will rule to reach a termination resulting from an employee's application for unemployment benefits.

## III.

 The second question presented in this case is whether a district court may consider a non-prevailing party's indigent status when it awards costs and disbursements to a prevailing party in a civil action. We generally review a district court's award of costs and disbursements for an abuse of discretion. *See Green–Glo Turf Farms, Inc. v. State,* 347 N.W.2d 491, 495 (Minn.1984). Whether the district court erred in its interpretation of the statute authorizing the award of costs and disbursements to Hannon, however, is a legal question that we review de novo. *See In re Welfare of R.S.,* 805 N.W.2d 44, 48–49 (Minn.2011).

Minnesota Statutes § 549.04, subd. 1, provides that "[i]n every action in a district court, the prevailing party ... *shall* be allowed reasonable disbursements paid or incurred." (Emphasis added.) The use of the word "shall" in a statute such as Minn. Stat. § 549.04, subd. 1, "indicates a duty that is mandatory, not one that is optional or discretionary." *Sawh v. City of Lino Lakes,* 823 N.W.2d 627, 637–38 (Minn. 2012) (citing *Webster's Third New International Dictionary* 2085 (3d ed.2002)); *see also* Minn.Stat. § 645.44, subd. 16 (2012) (" 'Shall' is mandatory."). The plain language of the statute therefore creates a mandatory duty for a district court to award a "reasonable" amount of costs and disbursements to the prevailing party. The requirement of reasonableness applies to the amount of costs and disbursements "paid or incurred" by the prevailing party, and thus does not depend on the non-prevailing party's ability to pay. The statute also does not categorically exclude any parties from their obligation to pay costs and disbursements. Thus, while a district court retains discretion to ensure that the amount of costs and disbursements allowed to the prevailing party is reasonable, it does not have discretion to relieve the non-prevailing party of its obligation to pay those costs and disbursements. *See Jostens, Inc. v. Nat'l Computer Sys., Inc.,* 318 N.W.2d 691, 704 (Minn.1982) (reversing a district court's decision to deny an award of disbursements because Minn. Stat. § 549.04, subd. 1, entitled the prevailing party to disbursements).

Despite the mandatory nature of Minn. Stat. § 549.04, subd. 1, Dukowitz relies on a court rule, Minn. R. Civ. P. 54.04(d), to argue that *any* award of costs and disbursements is discretionary. Rule 54.04(d) provides that "[t]he judge or court administrator *may* tax any costs and disbursements allowed by law." (Emphasis added.). While the rule's use of the word "may" provides some support for Dukowitz's interpretation, her interpretation ignores Minn. R. Civ. P. 54.04(a). Rule 54.04(a) states that "[c]osts and disbursements *shall* be allowed as provided by law." (Emphasis added.) In light of Rule 54.04(a), the only reasonable interpretation of Rule 54.04(d) is that it vests the authority to award costs and disbursements in *either* the judge *or* the court administrator, but that the award of costs and disbursements to the prevailing party is mandatory under Rule 54.04(a) and Minn.Stat. § 549.04, subd. 1.

 Finally, Dukowitz relies on federal case law to support her argument that the district court had discretion to consider Dukowitz's indigent status when it awarded costs and disbursements to Hannon. *See, e.g., Papas v. Hanlon,* 849 F.2d 702, 703–04 (1st Cir.1988) (per curiam). Du-

kowitz's reliance on federal case law is misplaced, however, because the Federal Rules of Civil Procedure do not impose a mandatory duty on courts to award costs and disbursements to the prevailing party. Rather, Federal Rule of Civil Procedure 54(d)(1) states that costs *"should* be allowed to the prevailing party." (Emphasis added). The use of the word "should" in a rule or a statute is not mandatory. *See, e.g., Qwest Corp. v. Fed. Commc'ns Comm'n,* 258 F.3d 1191, 1200 (10th Cir. 2001); *New England Tank Indus. of N.H. v. United States,* 861 F.2d 685, 694 (Fed. Cir.1988). Therefore, by using the term "should," Fed.R.Civ.P. 54(d)(1) grants discretion to federal district courts to determine whether a prevailing party is entitled to costs and disbursements. Neither Minn.Stat. § 549.04, subd. 1, nor Minn. R. Civ. P. 54.04(a), by contrast, contains a similar grant of discretion to Minnesota district courts.

Accordingly, we conclude that the district court did not err when it concluded that it lacked discretion to consider Dukowitz's indigent status when it awarded costs and disbursements to Hannon.

### IV.

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

LILLEHAUG, J., not having been a member of the court at the time of submission, took no part in the consideration or decision of this case.

WRIGHT, Justice.

I agree with the majority that a party's *in forma pauperis* status is not a factor that the district court may consider when it awards costs and disbursements to a prevailing party under Minn.Stat. § 549.04, subd. 1 (2012). However, I dis-

agree with the majority's conclusion that appellant Jane Kay Dukowitz ("Dukowitz") does not have a cognizable common-law cause of action for wrongful discharge against respondent Hannon Security Services ("Hannon"). In my view, an employee who alleges that she was discharged from employment because she filed an application for unemployment benefits has a common-law cause of action for wrongful discharge under the public-policy exception to the employment-at-will rule. For that reason, I respectfully dissent.

### I.

In the absence of an employment contract for a specified term, the general rule in Minnesota is that employment is at-will. *See Cederstrand v. Lutheran Bhd.,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). Under the employment-at-will rule, an employer may discharge an employee for a good reason, for a bad reason, or for no reason at all. *See Anderson–Johanningmeier v. Mid–Minn. Women's Ctr.,* 637 N.W.2d 270, 273 (Minn.2002). Like most jurisdictions, however, we have imposed certain common-sense constraints on the employment-at-will rule. *See Abraham v. Cnty. of Hennepin,* 639 N.W.2d 342, 351–52 (Minn.2002). One of those constraints is grounded in contract. *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983) (holding that a provision in a personnel manual may be enforceable as a unilateral contract). The other is grounded in tort and based on public policy. *See Phipps v. Clark Oil & Ref. Corp.,* 408 N.W.2d 569, 571 (Minn.1987) (recognizing public-policy exception to the employment-at-will rule). The scope of the latter constraint is the central dispute in this case.

We have recognized that the public-policy exception to the employment-at-will rule permits an employee to "bring an action for wrongful discharge if that em-

ployee is discharged for refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law." *Id.* We have not yet applied the public-policy exception to the employment-at-will rule beyond the circumstances that were present in *Phipps.*[1] *See Nelson v. Productive Alts., Inc.,* 715 N.W.2d 452, 457 n. 5 (Minn.2006) (declining to consider whether "other discharges in violation of public policy give rise to common-law causes of action, aside from those that we already recognized in *Phipps* "). In this case, the majority declines to apply the public-policy exception to an employee's alleged termination in retaliation for filing an application for unemployment benefits. The majority offers two reasons for this conclusion. Neither is persuasive.

The majority first expresses a "general reluctance" to recognize a new cause of action unless "the Legislature intends for us to do so." Indeed, the Legislature plays a significant—even the most significant—role in formulating the public policy of the state. *See Equitable Holding Co. v. Equitable Bldg. & Loan Ass'n,* 202 Minn. 529, 535, 279 N.W. 736, 740 (1938) (explaining that the Legislature "[o]rdinarily" de-

termines the public policy of the state); *see also Lucas v. Brown & Root, Inc.,* 736 F.2d 1202, 1205 (8th Cir.1984) ("Public policy is usually defined by the political branches of government."). But the Legislature's role is not exclusive. As a common-law court, we have "the power to recognize and abolish common law doctrines." *Lake v. Wal–Mart Stores, Inc.,* 582 N.W.2d 231, 233 (Minn.1998). We have explained that the common law "is not composed of firmly fixed rules" and "[a]s society changes over time, the common law must also evolve." *Id.* at 233–34. We have also observed that

> the common law is the result of growth, and ... its development has been determined by the social needs of the community which it governs. It is the resultant of conflicting social forces, and those forces which are for the time dominant leave their impress upon the law. It is of judicial origin, and seeks to establish doctrines and rules for the determination, protection, and enforcement of legal rights.... To be an efficient instrument, and not a mere abstraction, it must gradually adopt itself to changed conditions.

*Tuttle v. Buck,* 107 Minn. 145, 148–49, 119 N.W. 946, 947 (1909); *see also Lake,* 582

---

1. Our decision in *Phipps* is noteworthy because of its enigmatic character. In that case, the court of appeals "held that when an employer discharges an employee 'for reasons that contravene a clear mandate of public policy,' the employee has a cause of action for wrongful discharge." 408 N.W.2d at 570 (quoting *Phipps v. Clark Oil & Ref. Corp.,* 396 N.W.2d 588, 592 (Minn.App.1986)). Appellants petitioned for further review on that issue. *Phipps,* 408 N.W.2d at 570. However, we declined to address it because, while *Phipps* was pending before this court, the Legislature enacted the Whistleblower Act, Minn.Stat. §§ 181.931–.935 (2012). As a result, we stated that "the policy question of whether or not Minnesota should join the three-fifths of the states that now recognize,

to some extent, a cause of action for wrongful discharge" was no longer before us. *Phipps,* 408 N.W.2d at 571. I question whether the enactment of the Whistleblower Act eliminated the issue from the purview of this court. But even if it did, we then proceeded to hold that the employee in *Phipps*—who alleged that he was terminated from employment for refusing to violate the Clean Air Act—had a cause of action for wrongful discharge because the "[t]he Clean Air Act is ... a clearly mandated public policy to protect the lives of citizens and the environment." *Id.* Thus, while the majority's limited interpretation of *Phipps* arguably is justified, Dukowitz's argument that *Phipps* implicitly recognized a broader cause of action for wrongful discharge is equally plausible.

N.W.2d at 234. Thus, even though the Legislature generally defines public policy, "in common-law jurisdictions the courts too have been sources of law" for centuries. *Lucas,* 736 F.2d at 1205. Our responsibility to develop the common law is not contingent upon the Legislature granting us permission to do so. When applied here, the majority's view—that any extension of public policy is better left to the Legislature—presents an overly narrow view of the common law and abdicates this court's responsibility for developing it.

The majority points to variation in the parameters of the public-policy exception across jurisdictions as evidence of the judiciary's inability to delineate the contours of the exception. This analysis is unavailing. Variation in the exception across jurisdictions indicates very little because each state is free to determine for itself which employment practices, such as retaliatory discharges, violate the public policy of that state. More importantly, the prospect that it might be difficult in some hypothetical future case for us to decide the limits of the public-policy exception does not require us to deny Dukowitz a remedy here. The question presented is not whether we should adopt a public-policy exception. We did so in *Phipps.* And the majority does not overrule *Phipps.* Nor does *this* case call on us to elaborate the precise contours of the exception. Here, we are asked to decide only whether an employee who is discharged in retaliation for applying for partial unemployment benefits can maintain a cause of action under the public-policy exception to the employment-at-

will rule.[2] By foreclosing the possibility of expanding the public-policy exception beyond the circumstances present in *Phipps,* the majority—under the guise of exercising judicial restraint—has decided more than is necessary to resolve the controversy in this case.

The second reason offered by the majority is even less compelling. The majority contends that the public-policy exception is inappropriate because "the Legislature has already provided other remedies to vindicate the public policy of the state." I disagree. In my view, the mere existence of another remedy is not sufficient to crowd out this common-law wrongful-discharge claim. Indeed, we have specifically held that the existence of a statutory remedy does not preclude common-law wrongful-discharge claims. *See Nelson,* 715 N.W.2d at 455. In *Nelson,* we held that the adoption of the Whistleblower Act, Minn.Stat. §§ 181.931–935 (2012), did not bar the common-law wrongful-discharge claim that we recognized in *Phipps* "[b]ecause a statute should not be interpreted to modify the common law unless the statute does so explicitly." *Nelson,* 715 N.W.2d at 455. We, therefore, affirmed that the Legislature's subsequent creation of a statutory remedy did not preclude common-law wrongful-discharge actions premised on *Phipps.* *See Nelson,* 715 N.W.2d at 455–56. I would hold that the facts before us today fall within the cause of action articulated in *Phipps;* such a conclusion would not further encroach upon the common-law employment-at-will rule. Thus, the majority's second reason

2. The majority criticizes my dissent for failing to articulate a broad rule that would tell us, in every hypothetical future case, whether a retaliatory discharge violates a clear statement of public policy. But I do not purport to decide those future cases because doing so is neither required nor prudent. Rather, in addressing the facts as alleged before us today, it is evident that they are sufficient to support a claim under the public-policy exception to the employment-at-will rule. Those facts, as alleged, are that Dukowitz was discharged for vindicating a right provided under state law and articulated by the Legislature as the public policy of the state.

for declining to apply the public-policy exception to the facts presented here is inconsistent with our precedent.

The majority's reasoning is faulty for yet another reason. Generally, when developing our common law, we look to the common law of other states. *See Lake,* 582 N.W.2d at 234–35; *Salin v. Kloempken,* 322 N.W.2d 736, 738 (Minn.1982). Here, the overwhelming majority of jurisdictions recognize the public-policy exception to the employment-at-will rule. *See* Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 1.07 (5th ed.Supp. 2013) (surveying states). Only a small minority of states that have recognized the public-policy exception to the employment-at-will rule limit it to an employee's refusal to violate the law or report of a violation of law. *See* Margaret C. Hobday, *Protecting Economic Stability: The Washington Supreme Court Breathes New Life in the Public–Policy Exception to At–Will Employment for Domestic Violence Victims,* 17 Wm. & Mary J. Women & L. 87, 125 (2010) (noting that only two other states— Mississippi and Texas—limit the public-policy exception to the employment-at-will rule to refusals to violate the law or reports of violations of law). I discern no compelling reason to reach a decision that is inconsistent with the prevailing practice of other common-law states.

## II.

With the foregoing principles in mind, I now turn to the question that the majority avoids—whether an employer's retaliation against an employee who files for unemployment benefits violates a clear mandate of public policy.

Under Minnesota law, an individual is considered unemployed, and therefore potentially eligible for unemployment benefits, if "(1) in any week that the applicant performs less than 32 hours of service in employment ... and (2) any earnings with respect to that week are less than the applicant's weekly unemployment benefit amount." Minn.Stat. § 268.035, subd. 26 (2012). Thus, because an employee may qualify for unemployment benefits while still working a limited number of hours, it is possible for an employer to retaliate against an employee who applies for unemployment benefits by terminating the employee altogether. In this case, it is undisputed that Dukowitz was eligible for unemployment benefits at the time of her termination.

Minnesota Statutes section 268.03, subdivision 1 (2012), sets forth the public policy underlying unemployment benefits in Minnesota:

> The public purpose of this chapter is: Economic insecurity because of involuntary unemployment of workers in Minnesota is a subject of general concern that requires appropriate action by the legislature. The public good is promoted by providing workers who are unemployed through no fault of their own a temporary partial wage replacement to assist the unemployed worker to become reemployed. This program is the "Minnesota unemployment insurance program."

Minnesota Statutes section 268.192, subdivision 1 (2012), in turn, invalidates agreements between an employer and employee to forgo benefits and prohibits an employer from obstructing or impeding an application for unemployment benefits:

> Any agreement by an individual to waive, release, or commute rights to unemployment benefits or any other rights under the Minnesota Unemployment Insurance Law is void. Any agreement by an employee to pay all or any portion of an employer's taxes, is void. No employer may directly or indirectly make or require or accept any deduction from

wages to pay the employer's taxes, require or accept any waiver of any right or in any manner obstruct or impede an application or continued request for unemployment benefits. Any employer or officer or agent of any employer who violates any portion of this subdivision is, for each offense, guilty of a misdemeanor.

Taken together, these two statutes constitute a sufficiently clear mandate of public policy to form the basis of a common-law wrongful-discharge claim.

Section 268.03, subdivision 1, states that "[t]he public good is promoted by providing workers who are unemployed through no fault of their own a temporary partial wage replacement to assist the unemployed worker to become reemployed." In light of section 268.03, subdivision 1, we have recognized that the extension of unemployment benefits to those who are eligible is "the declared public policy of our state, as shown by the legislative declaration of public policy in the act." *Ackerson v. W. Union Tel. Co.*, 234 Minn. 271, 276, 48 N.W.2d 338, 341 (1951); *see also Bucko v. J.F. Quest Foundry Co.*, 229 Minn. 131, 142–43, 38 N.W.2d 223, 230–31 (1949). To ensure that benefits are available to under—and unemployed workers, the Legislature has forbidden employers from obstructing or impeding an application for unemployment benefits. *See* Minn.Stat. § 268.192, subd. 1. Indeed, that the Legislature has deemed such conduct criminal underscores the strong public policy at stake and allays any concerns about the judiciary's ability to discern "what employers' decisions contravene a clear mandate of public policy." *Anderson–Johanningmeier*, 637 N.W.2d at 277–78 (Blatz, C.J., concurring) (citation omitted) (internal quotation marks omitted). A common-law wrongful-discharge claim arising from

a discharge in retaliation for seeking unemployment benefits would advance that public policy by fostering additional deterrence, especially when the statutorily prescribed criminal remedy is competing— with violent and other serious crimes and misdemeanors—for limited prosecutorial resources. The statutory proscription against employer interference with an application or request for unemployment benefits, when read in conjunction with the clear statement of Legislative purpose, constitutes a clear mandate of public policy.

The only remaining question is whether permitting employers to discharge employees in retaliation for filing an application for unemployment benefits jeopardizes that public policy. The answer to that question undoubtedly is yes. Permitting employers to discharge employees who seek unemployment benefits deters eligible, economically vulnerable individuals— including part-time workers, seasonal workers, or workers who have their hours reduced—from seeking unemployment benefits to which they are statutorily entitled. Moreover, permitting such terminations exacerbates the very problem that unemployment insurance is designed to remedy—economic insecurity. *See* Minn. Stat. § 268.03, subd. 1 ("Economic insecurity because of involuntary unemployment of workers in Minnesota is a subject of general concern that requires appropriate action by the legislature.").

Consequently, it is not surprising that the overwhelming majority of state courts that have specifically addressed this question have concluded that their unemployment insurance statutes—which are substantially similar to Minnesota's statutory scheme—provide a clear public-policy basis for a wrongful-discharge claim.[3] Simi-

---

**3.** *See, e.g., Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994) (holding that "retaliatory

larly, in the closely related context of workers' compensation retaliation, the overwhelming majority of state courts permit recovery under the public-policy exception to the employment-at-will rule. *See, e.g., Darnell v. Impact Indus., Inc.,* 105 Ill.2d 158, 85 Ill.Dec. 336, 473 N.E.2d 935, 937 (1984); *Frampton v. Cent. Ind. Gas Co.,* 260 Ind. 249, 297 N.E.2d 425, 428 (1973); *Jackson v. Morris Commc'ns Corp.,* 265 Neb. 423, 657 N.W.2d 634, 635 (2003); *see also* Perritt, Jr., *supra,* § 7.09[B][3][b] (explaining that claims of retaliation for filing unemployment-insurance claims "arise less frequently than claims based on workers' compensation retaliation ... because most unemployment compensation claims are filed after employment has been terminated"). The majority fails to offer any persuasive reason to depart from the weight of this authority.

Because I conclude for the foregoing reasons that Dukowitz has a cognizable cause of action for wrongful discharge under the public-policy exception to the employment-at-will rule, I respectfully dissent.

PAGE, Justice (dissenting).

I join in the dissent of Justice Wright.

discharge of an employee who files a claim for partial unemployment benefits serves to frustrate a well-recognized and defined public policy of the state" (citation omitted) (internal quotation marks omitted)); *Highhouse v. Avery Transp.,* 443 Pa.Super. 120, 660 A.2d 1374, 1378 (1995) (allowing a tort claim for wrongful discharge in violation of public policy based on allegations that the employer discharged the employee for making a claim for unemployment compensation); *see also M.C. Welding & Machining Co. v. Kotwa,* 845 N.E.2d 188, 194–95 (Ind.Ct.App.2006) (holding that the evidence was sufficient to support the employee's claim that he was discharged in retaliation for applying for unemployment benefits); *Campbell v. Husky Hogs, L.L.C.,* 292 Kan. 225, 255 P.3d 1, 7 (2011) (recognizing retaliatory-discharge claim when an employee is terminated for filing a wage claim under the Kansas Wage Payment Act); *Smith v. Troy Moose Lodge No. 1044,* 96 Ohio App.3d 814, 645 N.E.2d 1352, 1353–54 (1994) ("If the right to receive unemployment compensation because of temporary unemployment represents the clear public policy of Ohio, it would contravene that clear public policy to terminate an employee for exercising his or her statutory right to participate in the benefits of the Unemployment Compensation Fund.").