Jennifer Marie AXELBERG, Appellant,

v.

COMMISSIONER OF PUBLIC SAFETY, Respondent.

No. A12–1341.

Supreme Court of Minnesota.

May 21, 2014.

Ryan Pacyga, Ryan Pacyga Criminal Defense, Minneapolis, MN, for appellant.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, Saint Paul, MN, for respondent.

Charles A. Ramsay, Daniel J. Koewler, Ramsey Law Firm, PLLC, Roseville, MN, for amicus curiae Minnesota Society for Criminal Justice and Minnesota Association of Criminal Defense Lawyers.

OPINION

GILDEA, Chief Justice.

The question presented in this case is whether a person who has had his or her driver's license revoked under Minnesota's implied consent law may raise the common law affirmative defense of necessity in a civil implied consent hearing under Minn. Stat. § 169A.53, subd. 3 (2012). Because we conclude that the plain language of the statute does not permit a person to raise the affirmative defense of necessity at an implied consent hearing, we affirm.

This case arises out of a domestic assault incident that took place over Memorial Day weekend in 2011. Appellant Jennifer Marie Axelberg (Axelberg), her husband Jason Axelberg (Jason), and two of their friends were staying at a lake cabin in Mora. On Sunday night, Axelberg and Jason were drinking at the nearby Fish Lake Resort. After they returned to the cabin, Axelberg and Jason started to argue while they were outside the cabin. Jason pushed Axelberg and hit her twice on the head.

Fearing for her safety, Axelberg got into her car and locked the doors. Axelberg retreated to the car because she felt that it was the only safe place available to her. Axelberg did not believe she could outrun her husband. And she could not go inside the cabin, because Jason was between her and the cabin. Finally, Axelberg could not call for help, because Jason had her cell phone.

Even after Axelberg got into the car, Jason continued to yell at her and started hitting the car's windshield. Eventually, Jason climbed onto the car, started screaming, and broke the windshield with his fist. Axelberg then started the car. Jason was still on top of the car, but he eventually climbed off as Axelberg started driving. Jason ran after Axelberg, yelling. Axelberg drove nine-tenths of a mile to Fish Lake Resort, the closest open business. Jason and one of the friends then walked to the resort, where Jason again confronted Axelberg in the parking lot. Someone at the resort called 911.

Law enforcement arrived at the resort at around 2:28 a.m. and arrested Jason. An officer also arrested Axelberg for driving while impaired. Axelberg was asked to take a chemical test for the presence of alcohol, and she agreed to a urine test. The test revealed an alcohol concentration of .16, which is twice the legal limit. *See* Minn.Stat. § 169A.52, subd. 2(1) (2012).

Pursuant to Minnesota's implied consent law, respondent, the Commissioner of Public Safety, revoked Axelberg's driver's license. Minn.Stat. § 169A.52, subd. 4 (2012). Axelberg sought judicial review of the revocation. Minn.Stat. § 169A.53, subd. 2 (2012).[1] At the implied consent hearing, Axelberg argued that she should not lose her license because she acted out of necessity to protect herself from her violent husband. The district court held that necessity is not an affirmative defense that drivers may raise to challenge a civil license revocation. A divided court of appeals affirmed. *Axelberg v. Comm'r of Pub. Safety,* 831 N.W.2d 682 (Minn.App. 2013). We granted Axelberg's petition for further review.

## I.

On appeal, Axelberg argues that she may raise the necessity defense at the implied consent hearing held pursuant to Minn.Stat. § 169A.53, subd. 3 (2012).[2] The

1. We have referred to the hearing held on the driver's petition for judicial review as the "implied consent hearing." *E.g., State v. Underdahl,* 767 N.W.2d 677, 686 (Minn.2009). We adopt the same terminology here.

2. The common law necessity defense has been used to excuse criminal conduct in "emergency situations where the peril is instant, overwhelming, and leaves no alternative but the conduct in question." *State v. Johnson,* 289 Minn. 196, 199, 183 N.W.2d 541, 543 (1971).

We have said that, in most criminal cases when the defense is recognized, the illegal act of the defendant was done "for the preservation of life." *Id.* at 201, 183 N.W.2d at 544. We have also recognized that necessity is a defense in civil tort actions. *Id.* And while we have addressed an issue involving a jury instruction given on the necessity defense in the context of a criminal case for impaired driving, *see State v. Hage,* 595 N.W.2d 200, 204 (Minn.1999), we have not addressed spe-

Commissioner argues that the statute does not permit drivers to raise the necessity defense. The parties' arguments present an issue of statutory interpretation, which we review de novo. *In re Welfare of J.B.,* 782 N.W.2d 535, 539 (Minn.2010). When a statute is "clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn.Stat. § 645.16 (2012). We agree with the Commissioner that the plain language of Minn.Stat. § 169A.53, subd. 3, does not allow drivers to raise the necessity defense.

Minnesota law requires the Commissioner to revoke a person's driver's license when the Commissioner receives a certification from a peace officer stating, in part, that the person submitted to a chemical test for the presence of alcohol and the test results indicated an alcohol concentration of .08 or higher. Minn.Stat. § 169A.52, subd. 4. A person may seek judicial review of the license revocation by filing a petition for judicial review. Minn. Stat. § 169A.53, subd. 2. The statute requires that the district court hold an implied consent hearing on the petition for review. *Id.,* subd. 3. And the statute limits the "scope" of an implied consent hearing. *Id.* Specifically, under Minn. Stat. § 169A.53, subd. 3(b), "[t]he scope of the hearing is limited to the issues in clauses (1) to (10)." None of the 10 issues listed involve the necessity defense. *See id.*[3]

■ The Commissioner argues that because the necessity defense is not included in the list of issues to which the Legislature has "limited" the implied consent hearing, drivers may not raise that defense. We agree. The Legislature has directed that words in Minnesota statutes are construed according to their "common and approved usage." Minn.Stat. § 645.08 (2012). The word "limited" means "[c]onfined or restricted within certain limits." *The American Heritage Dictionary* 1019 (5th ed.2011). The use of the word "limited" in Minn.Stat. § 169A.53, subd. 3, then, means that the issues a driver may raise at an implied consent hearing are restricted to those that fall within the topics in claus-

cifically whether the defense is available in the context presented here.

**3.** The issues are:
(1) Did the peace officer have probable cause to believe the person was driving, operating, or in physical control of a motor vehicle or commercial motor vehicle in violation of section 169A.20 (driving while impaired)?
(2) Was the person lawfully placed under arrest for violation of section 169A.20?
(3) Was the person involved in a motor vehicle accident or collision resulting in property damage, personal injury, or death?
(4) Did the person refuse to take a screening test provided for by section 169A.41 (preliminary screening test)?
(5) If the screening test was administered, did the test indicate an alcohol concentration of 0.08 or more?
(6) At the time of the request for the test, did the peace officer inform the person of the person's rights and the consequences of taking or refusing the test as required by section 169A.51, subdivision 2?
(7) Did the person refuse to permit the test?
(8) If a test was taken by a person driving, operating, or in physical control of a motor vehicle, did the test results indicate at the time of testing:
 (i) an alcohol concentration of 0.08 or more; or
 (ii) the presence of a controlled substance listed in Schedule I or II or its metabolite, other than marijuana or tetrahydrocannabinols?
(9) If a test was taken by a person driving, operating, or in physical control of a commercial motor vehicle, did the test results indicate an alcohol concentration of 0.04 or more at the time of testing?
(10) Was the testing method used valid and reliable and were the test results accurately evaluated?
Minn.Stat. § 169A.53, subd. 3(b).

es (1) through (10) of section 169A.53, subdivision 3(b). Because the necessity defense does not fall within one of those topics, the plain language of the statute compels us to hold that drivers may not raise the necessity defense at implied consent hearings.

Notwithstanding the Legislature's use of the term "limited" in subdivision 3(b), Axelberg argues that the scope of the hearing should not be so strictly confined. After all, Axelberg notes, the Legislature has provided for an affirmative defense in subdivision 3(c). In this subdivision, the statute provides that "[i]t is an affirmative defense for the petitioner to prove that, at the time of the refusal, the petitioner's refusal to permit the test was based upon reasonable grounds." Minn.Stat. § 169A.53, subd. 3(c). The Legislature's inclusion of one specific affirmative defense does not lead us to conclude that the Legislature meant to also include other affirmative defenses, such as the necessity defense, nor does it create an ambiguity as to the Legislature's intent.

An ambiguity might be created if the Legislature had provided for an affirmative defense that is not encompassed within the 10 issues that drivers may raise at the implied consent hearing. Inclusion of such a separate defense might call the meaning of the word "limited" into question and indicate that the word "limited" in subdivision 3(b) was not, in fact, meant to exclude the use of affirmative defenses. But that is not the case with respect to the affirmative defense that the Legislature specified in subdivision 3(c). The presence of the "reasonable grounds to refuse" affirmative defense does not open up the statute to additional affirmative defenses or create ambiguity as to the meaning of "limited" because the court could determine that whether the refusal was "reasonable" is within the scope of the issue listed in clause (7): whether the person refused to permit the test.[4]  *Id.*, subd. 3(b)(7).

4. The dissents of Justices Lillehaug and Wright argue that if the reasonable-grounds-to-refuse affirmative defense is relevant to clause (7), then the defense of necessity must also be relevant to some of the other issues to which the implied consent hearing is "limited." Minn.Stat. § 169A.53, subd. 3(b). But the Legislature did not provide in the statute for the availability of the necessity affirmative defense as the Legislature did for the reasonable-grounds-to-refuse affirmative defense. Essentially, the dissents propose to add words to the statute that the Legislature did not supply. Our precedent does not permit us to do that. *See Rohmiller v. Hart*, 811 N.W.2d 585, 590 (Minn.2012) ("We cannot add words or meaning to a statute that were intentionally or inadvertently omitted."). The dissents also suggest that the necessity defense does not expand the scope of the issues to which the hearing is limited because necessity is relevant to some of the issues listed in clauses (1) to (10). Justice Lillehaug argues that the affirmative defense of necessity is relevant to the issue of "driving, operating, or . . . physical control of a motor vehicle," a topic he contends is included in clauses (1) and (8) of the statute. Justice Wright does not rely on clause (1), but contends necessity is relevant to clause (8). The dissents are mistaken. Clauses (1) and (8) focus on the government and its burden. Specifically, clause (1) asks whether the police officer had probable cause to believe the driver was intoxicated. Clause (8) asks about the results of the chemical tests administered by law enforcement. Neither clause invites an inquiry into *why* a person may have decided to drive under the influence. Accordingly, the reason for the driver's action is not relevant to the issues listed in clauses (1) or (8). *Cf.* Minn. R. Evid. 401 (defining relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable"). The affirmative defense of reasonable grounds to refuse, by contrast, addresses the driver's behavior and the driver's behavior (i.e. refused to permit a test) is the subject of the issue listed in clause (7). The Legislature's provision for the driver to prove that her refusal was based on reasonable grounds

In addition, if we were to read *"an affirmative defense"* in subdivision 3(c) to allow for innumerable other affirmative defenses to be offered at implied consent hearings, we would be reading the word "limited" in subdivision 3(b) out of the statute entirely. The rules of statutory interpretation do not permit us to do that. *See* Minn.Stat. § 645.17(2) (2012) ("[T]he legislature intends the entire statute to be effective and certain.").[5]

Axelberg also argues that we should reject the interpretation that reasonable refusal, as specified in subdivision 3(c), is the only affirmative defense available because we do not presume that statutes derogate the common law unless they do so expressly or by necessary implication. *Brekke v. THM Biomedical, Inc.,* 683 N.W.2d 771, 776 (Minn.2004) ("We have long presumed that statutes are consistent with the common law, and if a statute abrogates the common law, the abrogation must be by express wording or necessary implication." (citations omitted) (internal quotation marks omitted)). Because there is no indication that the Legislature meant to restrict common law defenses in the Implied Consent Law, Axelberg argues, the com-

mon law defense of necessity must still be available. Axelberg's argument fails, though, because the canon of construction on which Axelberg relies does not apply to the Implied Consent Law, Minn.Stat. §§ 169A.50–.53 (2012), and even if it did, application of the canon confirms that the Legislature intended to preclude drivers from raising the common law defense of necessity.

As the Commissioner rightly points out, modern regulatory legislation, such as the implied consent administrative scheme, is "generally regarded as a newly conceived system of legal arrangements to deal with emergent problems in society." 3 Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 61:3, at 364 (7th ed.2008). Such legislation "is not subject to the rule of strict construction of statutes in derogation of the common law because its genesis and conception are wholly outside and apart from any common-law frame of reference." *Id.; see also Sec. Sav. & Loan Ass'n v. Wauwatosa Colony, Inc.,* 71 Wis.2d 174, 237 N.W.2d 729, 731–32 (1976) ("An exception to the rule of strict construction is customarily made in the case of a statute which pur-

therefore does not create ambiguity as to the Legislature's limitation on the scope of the implied consent hearing.

5. In dissent, Justice Wright also argues that precluding the necessity defense leads to an "unreasonable result," citing Minn.Stat. § 645.17(1) (2012) ("[T]he legislature does not intend a result that is absurd, impossible of execution, or unreasonable."). The dissent argues that under Minn.Stat. § 169A.53, subd. 3(c), "a person who refuses a chemical test for intoxication is permitted to assert the defense of necessity in arguing that the refusal was reasonable," and that it would be "unreasonable" for the Legislature then to not allow such a defense to a person who agreed to take the test and failed. We disagree. As an initial matter, Justice Wright builds her analysis on a premise that this case does not present. Specifically, Axelberg did

not refuse the test. Whether Axelberg would have been able to claim "necessity" as a "reasonable refusal," as Justice Wright's analysis presumes, therefore is simply not presented here. More importantly, the rule of construction that Justice Wright cites is "not available to override the plain language of a clear and unambiguous statute, except in an exceedingly rare case in which the plain meaning of the statute 'utterly confounds' the clear legislative purpose of the statute." *Schatz v. Interfaith Care Ctr.,* 811 N.W.2d 643, 651 (Minn.2012). This is not that rare case. The legislative purpose of the implied-consent laws is "to protect public safety on the highway." *Goldsworthy v. State Dep't of Pub. Safety,* 268 N.W.2d 46, 49 (Minn.1978). The plain language of the statute serves this purpose; it does not confound it.

ports to provide a complete system of law covering all aspects of the subject with which it deals, so as to supersede all prior law on the subject, whether common or statutory law." (citation omitted) (internal quotations omitted)). The Implied Consent Law exists outside of the common law and in that statutory scheme, the Legislature has provided a "complete system of law" on the topic of administrative license revocation for impaired drivers. *See Sec. Sav. & Loan Assn.*, 237 N.W.2d at 731–32. Accordingly, the canon of construction that we discussed in *Brekke* is not applicable here.[6]

Moreover, even if the canon of construction were applicable, as Justice Page contends in dissent, it would not support Axelberg's position that the necessity defense is available. Consistent with the canon, if the Legislature's words expressly or by necessary implication preclude application of the common law, the common law does

not apply. *Brekke*, 683 N.W.2d at 776. The Legislature did not expressly state in the Implied Consent Law that it was abrogating the common law. But that is the necessary implication of the Legislature's decision to "limit[ ]" the "scope" of implied consent hearings to the 10 issues listed in Minn.Stat. § 169A.53, subd. 3(b). *See Urban v. Am. Legion Dep't of Minn.*, 723 N.W.2d 1, 4–6 (Minn.2006) (finding the Legislature had clearly stated that "licensees" were responsible under the Civil Damages Act thus impliedly did not intend for the common law doctrine of respondeat superior to apply to CDA liability).[7]

Axelberg next argues that the common law defense of necessity should be available because we have referred to the implied consent law as "quasi-criminal," and therefore, common law defenses available in criminal cases should likewise apply to implied consent cases. We have used the

---

**6.** In his dissent, Justice Page argues that because we applied the canon of construction in *Brekke* we must similarly apply it here. Justice Page's dissent argues that the statute at issue in *Brekke*—Minn.Stat. § 181.79 (2012)—"was unknown at common law," and he supports this conclusion with a citation to 48B Am.Jur.2d *Labor and Labor Relations* § 2818 (2005). In this section, the author writes that "[t]he Fair Labor Standards Act ... is designed to implement social and economic policy through remedies not only unknown to common law but often in derogation of it." The citation is not helpful to the dissent's point because Minn.Stat. § 181.79, the statute at issue in *Brekke*, is not part of the Fair Labor Standards Act or Minnesota's version of that federal law. *See* Minn.Stat. § 177.21 (2012) ("Sections 177.21 to 177.35 may be cited as the 'Minnesota Fair Labor Standards Act.' "). More importantly, the statute at issue in *Brekke* restricts the ability of employers to make deductions from employees' wages and provides employees with a private right of action for an employer's violation of the statute. This statute creates a new cause of action but it does not create an entire system of law in the way that the Implied Consent Law does. The dissent also relies on *Neuber-*

*ger v. Hennepin Cnty. Workhouse*, 340 N.W.2d 330 (Minn.1979). But the dissent's reliance on *Neuberger* is misplaced, because as the dissent notes, we did not even discuss, much less invoke, the canon asserted in the present case.

**7.** Axelberg argues that Minn.Stat. § 169A.53, subd. 3(b), does not limit the issues that may be raised in an implied consent hearing because we have allowed parties to raise constitutional issues that are not mentioned in the statute at such hearings. *See Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828, 832 (Minn.1991) (addressing the Minnesota constitutional right to pre-testing counsel in an implied consent case). This case, however, does not involve a constitutional challenge to Axelberg's license revocation. In addition, while the Legislature is free to create a regulatory scheme that exists entirely outside of the common law, it is not free to create a regulatory scheme that violates the constitution. Thus, the fact that we have considered such constitutional challenges in an implied consent case does not mean that a driver may raise any challenge whatsoever at an implied consent hearing.

"quasi-criminal" label to describe the consequences of license revocation. *See Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828, 832 (Minn.1991); *Prideaux v. State Dep't of Pub. Safety*, 310 Minn. 405, 411, 247 N.W.2d 385, 389 (1976). At the same time, however, we have also recognized that once a driver has made a decision regarding testing, the proceeding "divide[s] clearly into its civil and criminal aspects." *Prideaux*, 310 Minn. at 410, 247 N.W.2d at 389. The criminal proceedings serve to punish the driver. *See* Minn.Stat. §§ 169A.20–.285 (2012). The civil proceedings, however, "protect public safety on the highway." *Goldsworthy v. State Dep't of Pub. Safety*, 268 N.W.2d 46, 49 (Minn. 1978). A driver's decision to challenge the Commissioner's administrative license revocation falls squarely on the civil side of the division. *Id.* Therefore, even if the necessity defense is available in the context of a criminal case for driving under the influence, that would not allow us to ignore the plain language of Minn.Stat. § 169A.53, subd. 3(b), which "limit[s]" "[t]he scope of" implied consent hearings.[8]

Finally, Axelberg and our dissenting colleagues argue that is it bad public policy to force victims of domestic abuse to choose between license revocation and personal safety. This public policy concern should be directed to the Legislature because we must read this state's laws as they are, not as some argue they should be. *See In re Estate of Karger*, 253 Minn. 542, 548, 93 N.W.2d 137, 142 (1958) ("What the law ought to be is for the legislature; what the law is, rests with the courts."); *see also* Minn.Stat. § 645.16 ("[T]he letter of the law shall not be disregarded under the pretext of pursuing the spirit."). As sound

as the public policy arguments may be, the only way to reach the conclusion that the common law affirmative defense of necessity is available here is through an act of pure judicial will. But as we recognized long ago, "[w]e have no personal or judicial will to accomplish," and we have no power to judge "acts of legislation [as] either good or bad." *State ex rel. Benson v. Bd. of Comm'rs*, 186 Minn. 524, 528, 243 N.W. 851, 853 (1932).

In essence, Axelberg's argument and the analysis of our dissenting colleagues prioritizes a policy that protects victims of domestic abuse over a policy that protects the public from impaired drivers. Axelberg contends that she was in fear for her life and that she made the only choice she could, given her husband's violent behavior. But it is also true that when she made that choice, and drove with an alcohol concentration that was more than twice the legal limit, Axelberg created a substantial risk to public safety. That Axelberg did not harm anyone is fortunate, but that fact does not provide a basis for us to discount the public safety risk impaired drivers present. *See Heddan v. Dirkswager*, 336 N.W.2d 54, 63 (Minn.1983) ("[D]runken drivers pose a severe threat to the health and safety of the citizens of Minnesota."). This case therefore could be cast in terms of competing policy considerations, with policies aimed at protecting victims of domestic abuse competing with policies aimed at protecting victims of impaired drivers. The statute in this case, however, addresses only the latter. *See Goldsworthy*, 268 N.W.2d at 49 ("The primary thrust of the implied consent law is remedial and intended to protect public safety on the highway."). We decline Ax-

---

8. As noted above, we have recognized the defense of necessity in civil tort cases. *See supra* n. 2. Justice Page's dissent therefore is mistaken in contending that we conclude

"that the necessity defense is unavailable because that defense only applies in criminal cases."

elberg's and the dissents' invitation to prioritize a policy goal that is not expressed in the statute at the expense of one that is the clear focus of the legislation. In short, if the Implied Consent Law needs revision in order to make it embody a more sound public policy, the Legislature, not the judiciary, must be the reviser.[9]

Affirmed.

LILLEHAUG, J. (dissenting).

Today the majority decides that Jennifer Axelberg must lose her right to drive, even if she drove impaired to save her life or escape serious injury. The majority asserts that this outcome is required because the Legislature has tied the judiciary's hands. In my view, the majority has manufactured and applied its own bindings. Because there is room for justice in this case, I respectfully dissent.

## I.

The majority's statement of facts is accurate, but the key points bear retelling. During an argument, Jennifer Axelberg's spouse hit her twice in the head. He had her cell phone. She took refuge in their car. She would have stayed there, but her enraged attacker climbed onto the hood and broke the windshield. At 2 a.m. in the isolated woods, her only alternative was to start the car and drive away from him. Even then, her attacker pursued her on foot. Axelberg drove less than a mile to reach a place of relative safety. The incident ended there when law enforcement arrived. Axelberg was arrested for driving while impaired, and her husband was arrested for domestic assault and disorderly conduct.

Axelberg was a victim of the crime of domestic violence. Although she drove while impaired, she has a strong defense that she acted only as necessary to avoid death or serious injury. And yet the Commissioner of Public Safety[1] revoked Axelberg's license and pursued revocation upon judicial review. The Commissioner argues, and the majority agrees, that necessity—the emergency avoidance of death or serious bodily injury—is not even relevant to, much less a defense in, a judicial review hearing. I disagree.

## II.

We start with the structure of what the Legislature labels the Implied Consent Law. *See* Minn.Stat. §§ 169A.50–.53 (2012). Section 169A.51 establishes implied consent for intoxication testing and outlines requirements for such testing. Section 169A.52 establishes civil consequences, including license revocation, for test refusal or failure.

When the Commissioner revokes a license, section 169A.53 allows the driver to seek review. The driver may obtain administrative review under subdivision 1, judicial review under subdivisions 2 and 3,

---

9. The parties raised a number of other statutory construction arguments, such as the argument that remedial statutes must be broadly construed in favor of public safety and against the private interests of the drivers involved. But such canons of construction operate only after we have concluded that a statute is ambiguous. *Billion v. Comm'r of Revenue*, 827 N.W.2d 773, 778 (Minn.2013). Because we find that Minn.Stat. § 169A.53, subd. 3(b), is unambiguous, we do not need to reach those arguments here.

1. The Commissioner has statutory authority to pursue license revocation. *See* Minn.Stat. § 169A.52 (2012). Among the Commissioner's other statutory responsibilities are promoting "the highest attainable standards of ... justice for crime victims," Minn.Stat. § 611A.74 (2012), including through the Crime Victims Services, advocating for the rights of victims of domestic violence, *see* Minn.Stat. §§ 518B.02, subd. 3, 611A.201, subd. 2(1) (2012).

or both forms of review. Minn.Stat. § 169A.53, subds. 1–3. This case arises out of Axelberg's petition for judicial review.

Briefly, judicial review consists of a hearing in district court, conducted in most respects according to the Minnesota Rules of Civil Procedure. Minn.Stat. § 169A.53, subds. 2(d), 3(a). The hearing, while civil in nature, may be held at the same time as a hearing on pretrial motions in a criminal case for driving while impaired. *Id.*, subd. 3(a). The "scope" of the hearing is governed by subdivision 3(b).

Subdivision 3(b) provides: "The scope of the [judicial review] hearing is *limited to the issues* in clauses (1) to (10)." Minn. Stat. § 169A.53, subd. 3(b) (emphasis added). Clauses (1) through (10) are phrased in the form of questions. To sustain a revocation based on test refusal or failure, the Commissioner must, by a preponderance of the evidence, persuade the court to answer "yes" to the relevant questions. *See State v. Halvorson*, 288 Minn. 424, 431, 181 N.W.2d 473, 477 (1970) (placing a preponderance of the evidence burden of proof on the Commissioner in an implied consent hearing).

While subdivision 3(b) does not allow open-ended judicial review, neither does it provide that the hearing is restricted to answering questions. Significantly, subdivision 3(b) does not say that the scope of judicial review is "limited to clauses (1) to (10)," or "limited to *the questions in* clauses (1) to (10)." Instead, subdivision 3(b) provides that the scope is "limited to *the issues* in clauses (1) to (10)." (Emphasis added.) The majority and I agree that the word "issues" means "topics." Thus, it follows that any and all of the topics in clauses (1) through (10) are within the scope of judicial review. These topics include probable cause; driving, operation, and physical control of the vehicle; the

arrest; test taking or refusal; and test results.

While the Commissioner has the burden to prevail on the relevant questions in subdivision 3(b), subdivision 3(c) puts a burden on the driver. Subdivision 3(c) provides: "It is an affirmative defense for the petitioner to prove that, at the time of the refusal, the petitioner's refusal to permit the test was based upon reasonable grounds." Minn.Stat. § 169A.53, subd. 3(c).

### III.

With the structure of the statute in mind, I turn to the issue of whether the judicial review hearing may include the affirmative defense of necessity. The defense of necessity is a narrow one, but it is deeply rooted in our legal system.

As the majority acknowledges, necessity is a valid defense in both criminal cases and civil tort actions. *State v. Johnson*, 289 Minn. 196, 200–02, 183 N.W.2d 541, 544–45 (1971). Necessity is a defense "only in emergency situations where the peril is instant, overwhelming, and leaves no alternative but the conduct in question." *Id.* at 199, 183 N.W.2d at 543. While we recognize the severe threat posed by drunken drivers, *see Heddan v. Dirkswager*, 336 N.W.2d 54, 63 (Minn.1983), we also recognize that a necessity instruction may be appropriate in circumstances such as Axelberg's, when an intoxicated victim's only means to escape domestic violence is by vehicle. *See State v. Hage*, 595 N.W.2d 200, 202 (Minn.1999) (affirmative defense instruction given in criminal case when defendant asserted that she sought refuge in a car to flee from her abusive boyfriend). Moreover, the Legislature has excluded from the crime of reckless driving "the emergency operation of any vehicle when avoiding imminent danger." Minn. Stat. § 169.13, subd. 3(b)(2) (2012).

I appreciate the majority's point that our system of license revocation and review is neither a criminal proceeding nor a civil tort action, but a statutory administrative and judicial scheme without a common-law counterpart. So I agree with the majority that this case is one of statutory interpretation in which we read the Legislature's words to decide whether it either: (a) banned all affirmative defenses except reasonable refusal; or (b) left room for the judiciary to recognize the defense of necessity.

## IV.

Neither subdivision 3(b) nor 3(c) specifically references "necessity." *See* Minn. Stat. § 169A.53, subd. 3(b)-(c). But mere silence on a particular topic does not mean that the statute is unclear or ambiguous unless the silence generates more than one reasonable interpretation. *See Premier Bank v. Becker Dev., LLC,* 785 N.W.2d 753, 760 (Minn.2010). The majority and I agree that the words of section 169A.53 are clear and unambiguous, but we come to precisely opposite conclusions about what they signify. In my view, the majority's reading, which would bar the judiciary from doing justice, is unreasonable.

Tellingly, in subdivision 3(c), the Legislature chose the phrase "*an* affirmative defense," employing the indefinite article "an." The Legislature did not employ a definite article, such as "the." *State v. Hohenwald,* 815 N.W.2d 823, 830 (Minn. 2012) (interpreting the plain meaning of a statute based on the use of the definite article "the," which is a "word of limitation" that refers to "a specific object"). So, as used here, the word "an" means "one," as in: "It is one affirmative defense." If the Legislature had meant to allow only a single affirmative defense and prohibit all others, it could have said so with ease. It could have used phrases such as "*the only* affirmative defense," "*the one* affirmative defense," or simply "*the* affirmative defense."

Also significant is that the affirmative defense the Legislature described incorporates the word "reasonable." This signals that the Legislature did not intend judicial review to be a mechanical, answer-the-question-and-only-the-question process without regard to reason. Rather, judicial review is a place where justice can be done.

Another strong statutory signal that the Legislature intended judicial review to be more than a mechanical answering of questions is the administrative review established by subdivision 1. If the Legislature truly wanted the judiciary to turn a blind eye to injustice, likely it would have blinded the administrative reviewer as well. To the contrary, the administrative reviewer may consider not just the evidence upon which the revocation was based, but "any other material information" for the purpose of determining whether "sufficient cause exists" for revocation. Minn.Stat. § 169A.53, subd. 1. It is troubling that, under the majority's reading, the statute gives an administrative reviewer authority to do justice, while the judiciary cannot.

But, says the majority, the judiciary is restrained because subdivision 3(c) uses the term "limited" to describe the scope of the hearing. Of course the hearing is "limited," but limited to what? The hearing is limited to the "issues," or topics, in clauses (1) through (10). The majority notes that the affirmative defense of "reasonable" test refusal is relevant to the issue of test refusal, the topic of clause (7). The affirmative defense of "reasonable" test refusal explains why the person did not take the test. In the same manner, the affirmative defense of necessity is relevant to the issue of "driving, operating, or ... physical control of a motor vehicle," a

topic included in clauses (1) and (8). The affirmative defense of necessity explains why the person drove, operated, or was in physical control of the motor vehicle.

The majority's stingy reading of the statute produces injustice, not only here but in other cases. If, as the majority holds, the statute prohibits all affirmative defenses but reasonable refusal, then any and all test failures would require license revocation, no matter the underlying facts. For example, it would be improper for a court to consider whether a driver had consumed alcohol after driving but before the test, and all such evidence would be irrelevant as a matter of law.

In this regard, the majority's holding tacitly overrules a sensible, long-standing court of appeals precedent, *Dutcher v. Commissioner of Public Safety*, 406 N.W.2d 333 (Minn.App.1987), which recognized an affirmative defense for post-driving alcohol consumption. As the *Dutcher* court recognized, post-driving consumption "certainly is germane . . . [and a] contrary result could revoke the license of one entirely sober at the time of the accident who thereafter imbibed but did not drive." *Id.* at 336.

Over the last quarter century, we have never had occasion to review the holding in *Dutcher* and the Legislature has never overridden it. In fact, the Legislature has codified the post-driving consumption defense in criminal proceedings. Minn.Stat. § 169A.46, subd. 1 (2012). Unlike the majority opinion today, *Dutcher's* holding represents good common sense.

In summary, there is nothing in the statute whereby the Legislature tied the judiciary's hands to prevent us from recognizing an affirmative defense to avoid manifest injustice. The plain words of the statute are to the contrary.

## V.

Because the words of the law are sufficiently explicit to ascertain and effectuate the intent of the Legislature, and their application to this situation is clear and free from all ambiguity, there is no need to turn to the canons of construction in Minn. Stat. § 645.16 (2012). If we did apply the canons, however, it is hard to imagine that the Legislature intended that the judiciary revoke the licenses of victims who drive only to escape domestic violence.

A driver's license is an important property interest. *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *In re Source Code Evidentiary Hearings*, 816 N.W.2d 525, 540 n. 16 (Minn.2012); *Heddan v. Dirkswager*, 336 N.W.2d 54, 58 (Minn.1983). For anyone, loss of a driver's license can be devastating. *Prideaux v. State Dep't of Pub. Safety*, 310 Minn. 405, 410, 247 N.W.2d 385, 389 (1976). But the stakes are even higher for victims of domestic violence. Loss of a license may deprive them of financial independence, treatment and counseling services, transportation for their children, and the only reliable means of escape in the next emergency. *See* Minn.Stat. § 645.16(6) (stating that "the consequences of a particular interpretation" are relevant to determining legislative intent).

In recent years the Legislature has taken the initiative to protect—not penalize and stigmatize—victims of domestic violence. For example, and of special relevance here, in 2006 the Legislature recognized that victims "establish new addresses in order to prevent their assailants or probable assailants from finding them." Minn.Stat. § 5B.01 (2012). Under the Minnesota Secretary of State's "Safe at Home" program, Minn. R. Ch. 8290 (2013), victims may use a designated address in all public matters, including on driver's licenses and in court proceedings.

Now, because of the majority's unwillingness to read the law to avoid manifest injustice, the Legislature may wish to consider further measures to protect the next Jennifer Axelberg.

Finally, I am perplexed by the majority's contention that any reading of the statute that does not foreclose the necessity defense is somehow an "act of pure judicial will" that constitutes a legislative-style policy choice. To the contrary; each of the three dissents is grounded in a careful analysis of the statutory text. Moreover, the necessity defense is not a mere policy preference; it is a legal concept deeply rooted in our jurisprudence. That is why we recognized it in *Hage,* 595 N.W.2d 200, another drunk driving case.

If there is any "pure judicial will" being exercised in this case, it might be the majority's interpretation of this statute without regard to its "application to an existing situation," Minn.Stat. § 645.16. Such judicial will sometimes operates "under the guise of exercising judicial restraint," *see Dukowitz v. Hannon Sec. Serv.,* 841 N.W.2d 147, 158 (Minn.2014) (Wright, J., dissenting).

Yes, we must never disregard "the letter of the law . . . under the pretext of pursuing the spirit." Minn.Stat. § 645.16. But, likewise, we must never disregard the spirit of the law under the pretext of pursuing the letter. In this case, both the letter and the spirit of the law leave room for us to do justice.

Accordingly, I respectfully dissent. I also join the dissents of Justice Wright and Justice Page.

PAGE, Justice (dissenting). I join in the dissent of Justice LILLEHAUG.

WRIGHT, Justice (dissenting). I join in the dissent of Justice LILLEHAUG.

WRIGHT, Justice (dissenting).

Because I conclude that Minn.Stat. § 169A.53, subd. 3(c) (2012), does not foreclose recognition of the affirmative defense of necessity in the context of implied consent proceedings, I respectfully dissent and join the dissents of Justice Page and Justice Lillehaug. If the Legislature had intended that reasonable test refusal be the only affirmative defense available in an implied consent hearing, it easily could have said so. It did not, and the majority need not read such a restriction into the statute.

I write separately to address another reason why Axelberg should be permitted to raise the necessity defense in an implied consent hearing. Interpreting Minn.Stat. § 169A.53, subd. 3(b) (2012), to preclude the defense of necessity leads to an unreasonable result. This unreasonable result can be avoided, however, by recognizing that the affirmative defense of necessity is relevant to the inquiry in an implied consent hearing under Minn.Stat. § 169A.53, subd. 3(b)(8).

The implied consent law contemplates two bases for revocation of a person's driver's license: (1) refusing to submit to a chemical test for intoxication (test refusal) and (2) driving, operating, or controlling a motor vehicle with an alcohol concentration of 0.08 or more or while under the influence of a controlled substance, as confirmed by a chemical test for intoxication (test failure). Minn.Stat. § 169A.52, subds. 3, 4 (2012). In an implied consent hearing, the judge reviews whether the person engaged in prohibited conduct— test refusal, Minn.Stat. § 169A.53, subd. 3(b)(7), or test failure, Minn.Stat. § 169A.53, subd. 3(b)(8)—that would justify driver's license revocation.

The majority's interpretation of Minn. Stat. § 169A.53, subd. 3(b), to preclude the defense of necessity produces an unreason-

able result. Yet, we are obligated to avoid interpreting the language of a statute in a manner that yields an unreasonable result. *See Wegener v. Comm'r of Revenue*, 505 N.W.2d 612, 617 (Minn.1993) (recognizing our obligation to go beyond the plain language of the statute if a literal interpretation "leads to absurd results or unreasonable results which utterly depart from the purpose of the statute"); *see also* Minn. Stat. § 645.17(1) (2012) ("[T]he legislature does not intend a result that is absurd, impossible of execution, or unreasonable."). Under Minn.Stat. § 169A.53, subd. 3(c), a person who refuses a chemical test for intoxication is permitted to assert the defense of necessity in arguing that the refusal was reasonable. But, under the majority's interpretation of Minn.Stat. § 169A.53, subd. 3(b), if the same person consents to the test and fails, that person is barred from asserting the defense of necessity. No discernable policy choice by the Legislature justifies the inconsistent treatment of test refusal and test failure cases that results from the majority's interpretation. Instead, this inconsistency invites well-informed (or well-counseled) drivers facing similar circumstances to refuse to submit to chemical tests for intoxication. The Legislature's decision to criminalize the refusal of a chemical test for intoxication clearly is intended to produce the *opposite* result—to induce drivers to submit to such tests. *See* Minn.Stat. § 169A.20, subd. 2 (2012) (making it a criminal offense to refuse to submit to a chemical test for intoxication). Permitting necessity to be invoked as a defense to test refusal but not as a defense to test failure is both unreasonable and contrary to the Legislature's intent.

By contrast, such an unreasonable result easily is avoided by recognizing that the affirmative defense of necessity is relevant to the inquiry in an implied consent hearing under Minn.Stat. § 169A.53,

subd. 3(b)(8). Having acknowledged, as the majority does, that reasonable test refusal is relevant in an implied consent hearing under subdivision 3(b)(7), it is clear that necessity is similarly relevant under subdivision 3(b)(8). At the core of both affirmative defenses is an assertion that the unlawful conduct was justified under the circumstances, thereby eliminating any rationale for revoking the license. The doctrine of necessity arises from a judicial recognition that "obedience to the law would have endangered some higher value." *State v. Johnson*, 289 Minn. 196, 201, 183 N.W.2d 541, 544 (1971) (citation omitted) (internal quotation marks omitted); *see also United States v. Bailey*, 444 U.S. 394, 410, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) ("[T]he defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils."). By its terms, the defense of necessity asks whether, under dire circumstances, violation of the law was the only reasonable alternative. It is, therefore, erroneous to conclude that the defense of necessity is not relevant to any of the topics enumerated in subdivision 3(b) as within the scope of an implied consent hearing. When correctly construed, the statute is not susceptible to the inconsistency of rendering necessity relevant in cases of test refusal but irrelevant in cases of test failure.

Necessity is a narrow defense because it "applies only in emergency situations where the peril is instant, overwhelming, and leaves no alternative but the conduct in question." *Johnson*, 289 Minn. at 199, 183 N.W.2d at 543. Accordingly, application of the doctrine of necessity requires close attention to the particular factual circumstances of a case. Here, Jennifer Axelberg was arrested for driving while

impaired after she fled a violent assault at the hands of her husband. At 2 a.m. in a remote wooded area, he hit her twice in the head. With her violent husband standing between her and the house and her cell phone in his possession, Axelberg sought refuge in their car. Without a necessity defense, Axelberg violated the law *simply by seeking refuge in the family car* and, therefore, was subject to revocation of her driver's license.[1] Axelberg's husband then climbed on top of the car and broke the windshield with his bare fists. With no way to call for help and no other means of escape, Axelberg started the car and drove to the nearest open business. Any reasonable person would have feared for her safety, but given that Axelberg was acting against the backdrop of domestic violence, the danger she was facing is even more apparent.[2]

The majority seeks to minimize my analysis as an improper attempt to prioritize a policy of protecting victims of domestic violence over a policy of discouraging impaired driving. To the contrary, my analysis reveals a flaw in the majority's interpretation of Minn.Stat. § 169A.53, subd. 3(b). That the majority's unreasonably narrow interpretation inflicts injustice on victims of domestic violence makes its conclusion all the more unsound.

Domestic violence is a widespread problem in Minnesota. An estimated 27 percent—more than one quarter—of Minnesota women have experienced domestic violence in their lifetimes.[3] This is consistent with estimates of the pervasiveness of domestic violence nationwide.[4] Too often, domestic assaults turn deadly. The Minnesota Coalition for Battered Women, which has been collecting and reporting data on domestic violence since 1989, reports that at least 25 women in Minnesota died from domestic violence in 2013.[5] At least 542 women have been murdered in domestic violence situations in Minnesota since the Coalition began collecting data.[6]

1. *See State v. Fleck*, 777 N.W.2d 233, 236 (Minn.2010) ("[A] person is in physical control of a vehicle if he has the means to initiate any movement of that vehicle, and he is in close proximity to the operating controls of the vehicle.").

2. The majority notes that the common law defense of necessity in criminal cases generally requires that the illegal act was done "for the preservation of life." *Johnson*, 289 Minn. at 201, 183 N.W.2d at 544. Given that Axelberg's husband broke a windshield with his bare hands, there is little question that Axelberg's life was threatened. The question here, however, is not whether Axelberg has presented sufficient evidence to prove necessity as a defense, but whether she should even be *permitted* to present such evidence and argue in an implied consent hearing that her conduct was excused by necessity.

3. Office of Justice Programs, Dep't of Pub. Safety, *Domestic Violence: Results from the 2008 Minnesota Crime Victim Survey* 1 (2009),

*available at* https://dps.mn.gov/divisions/ojp/forms-documents/Documents/!09%20Domestic%20Violence%20Report.pdf.

4. Patricia Tjaden & Nancy Thoennes, Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, *Extent, Nature, and Consequences of Intimate Partner Violence: Findings from the National Violence Against Women Survey* 9 (2000), *available at* https://www.ncjrs.gov/pdffiles1/nij/181867.pdf (reporting that 25 percent of women surveyed said they had been assaulted by an intimate partner in their lifetimes).

5. Minn. Coal. for Battered Women, *2013 Annual Femicide Report* 3, *available at* http://media.wix.com/ugd/f4bdb8_35de63f40fa04f8e9a5328ace33045ed.pdf. The report notes that the actual numbers might be greater because the Coalition relies in part on media coverage, and violence against women in some communities is often unreported. *Id.* at 6.

6. *Id.* at 2–3.

Social isolation is often an accessory to domestic violence, making the victim feel increasingly helpless and dependent on the abuser.[7] By controlling what the victim does and with whom she interacts, the abuser can destroy the victim's support network and make her more physically vulnerable.[8] Victims of domestic violence in rural areas are further isolated by geography.[9] For women in rural Minnesota and even the suburbs, where public transportation is generally unavailable, cars can provide a degree of social and economic independence and sometimes, as this case illustrates, a safe haven. Without the freedom a driver's license affords, a victim of domestic violence is subject to even greater control by her abuser.

While the implied consent law limits the scope of an implied consent hearing, Minn. Stat. § 169A.53, subd. 3(b), the implied consent law does not mandate that we relinquish our good judgment when exercising our power of judicial review. The law need not be construed to require a person being subjected to an unprovoked, violent attack to choose between her immediate personal safety and the possibility of losing her driver's license and the independence that comes with it. By refusing to give Axelberg even the opportunity to present evidence of necessity in this case, the decision reached by the majority retreats to an overly narrow interpretation of the implied consent law and declines to grapple with the complexity and danger of domestic violence and the circumstances Axelberg was facing. For these reasons, I agree with Justice Page and Justice Lillehaug that statutory interpretation does not compel such a result in this case. Therefore, I respectfully dissent.

PAGE, J. (dissenting). I join in the dissent of Justice WRIGHT.

LILLEHAUG, J. (dissenting). I join in the dissent of Justice WRIGHT.

PAGE, Justice (dissenting).

Today the court, in essence, concludes that losing the privilege to drive is a small price to pay for saving your life. In reaching this conclusion, the court fails to adhere to our rules of statutory construction, our case law, and our constitutional mandate to do justice. Therefore, I respectfully dissent.

### I.

First, it is important to have a full understanding of the implications of the court's decision. The court's decision not

---

7. *See, e.g.,* Margaret E. Johnson, *Redefining Harm, Reimagining Remedies, and Reclaiming Domestic Violence Law,* 42 U.C. Davis L.Rev. 1107, 1116 (2009); Tjaden & Thoennes, *supra* note 4, at 33 ("[R]esearch shows that wife assault is more common in families where power is concentrated in the hands of the husband or male partner and the husband makes most of the decisions regarding family finances and strictly controls when and where his wife or female partner goes.").

8. Kerry Healey, et al., Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, *Batterer Intervention: Program Approaches and Criminal Justice Strategies* 3–5 (1998), *available at* https://www.ncjrs.gov/pdffiles/168638.pdf.

9. Adria Gallup–Black, *Rural and Urban Trends in Family and Intimate Partner Homicide: 1980–1999,* at 7 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/208344.pdf. Some scholars have even argued that some abusive men choose to live in rural areas to "facilitate the isolation that is conducive to their abusive behavior." *See, e.g.,* Douglas A. Brownridge, *A Comparison of Partner Violence Against Women in Rural and Urban Canada—Prevalence, Correlates, Consequences, and Help–Seeking Behavior, in* Intimate Partner Violence 11-1, 11-4 (Kathleen A. Kendall–Tackett & Sarah M. Giacomoni eds., 2007).

only discourages victims of domestic abuse who happen to be intoxicated from fleeing their abusers when the only means to do so is in a motor vehicle and allows them to be punished if they do, it goes further. By its decision, the court also discourages domestic abuse victims from even seeking refuge in a motor vehicle. Based on our case law, today's decision deprives many victims of domestic violence [1] of the only available refuge. That is because an intoxicated person is guilty of violating our driving-while-impaired statute if the person "drive[s], operate[s], or [is] *in physical control* of any motor vehicle." Minn.Stat. § 169A.20, subd. 1 (2012) (emphasis added). We have held that a person is in physical control of a motor vehicle if the person "has the means to initiate any movement of that vehicle, and he [or she] is in close proximity to the operating controls of the vehicle." *State v. Fleck,* 777 N.W.2d 233, 236 (Minn.2010).

To illustrate, in *Fleck,* the defendant was found in his vehicle, outside of his apartment, with the keys in the center console. 777 N.W.2d at 235. Even though he had not recently driven the vehicle, we concluded that Fleck "was in a position to exercise dominion or control over the vehicle and that he could, without too much difficulty, make the vehicle a source of danger." *Id.* at 237; *see also State v. Starfield,* 481 N.W.2d 834, 835 (Minn.1992) (reinstating a defendant's conviction who was found stuck in a snow-filled ditch without the keys in the ignition); *State v. Juncewski,* 308 N.W.2d 316, 319–20 (Minn. 1981) (concluding that the motor of a vehicle need not be running to find that a defendant was in physical control of the vehicle). Certainly the same is true when,

as here, the Commissioner need only prove by a preponderance of the evidence that the petitioner was in physical control of the vehicle. *See State v. Halvorson,* 288 Minn. 424, 431, 181 N.W.2d 473, 477 (1970). Thus, upon entering the vehicle, Axelberg, without having made any attempt to start or drive the vehicle, was in violation of Minn.Stat. § 169A.20 and subject to the loss of her driving privileges simply because she attempted to shelter herself from her husband's abuse.

The court asserts that "the analysis of [the] dissenting [opinions] prioritizes a policy that protects victims of domestic abuse over a policy that protects the public from impaired drivers." That assertion suggests that the two policies are mutually exclusive. But in fact they are not mutually exclusive and can be harmonized in a way that protects the public from impaired drivers while at the same time not punishing the victim of domestic violence who seeks shelter from her abuser in a motor vehicle.

This case provides an example of how the appropriate balance can be struck. Here, Axelberg drove only when she faced near certain bodily injury or death. The risk to the public was minimized because she drove at a time and on a road not likely to have traffic, either vehicular or pedestrian, and drove only as far as necessary to obtain protection from her husband and no farther. Indeed, it is the absence of other people that makes the necessity defense appropriate in this case. Thus, allowing the necessity defense in license revocation hearings under Minn.Stat. § 169A.53, subd. 3 (2012), allows the district court to harmonize the interests of

---

1. An estimated 36% of domestic violence victims have chemical dependency problems, often an unfortunate aftereffect of abuse. James J. Collins & Donna L. Spencer, *Linkage* *of Domestic Violence and Substance Abuse Services* 1, 9 (1999), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/194122.pdf.

the general public with those of victims of physical or sexual violence.

Finally, the necessary implication of the court's decision is that the necessity defense is unavailable not only in cases of domestic abuse, but also in cases in which a victim is seeking refuge from a violent physical or sexual assault or kidnaping, and the court's decision thus discourages those individuals from seeking shelter in a motor vehicle as well.

## II.

In its slavish attempt to adhere to section 169A.53's plain meaning, the court ignores the well-recognized rule of statutory construction that statutes in derogation of the common law are to be strictly construed.[2] In rejecting this approach, the court states that this rule does not apply because the implied consent law is part of our "modern regulatory legislation." Because the law was unknown to the common law, the court reasons, the rule of strict construction is inapplicable. The court is wrong. We recently applied this rule to a civil wage-and-hour statute unknown to the common law in *Brekke v. THM Biomedical, Inc.*, 683 N.W.2d 771 (Minn. 2004).

In *Brekke,* the plaintiff sued his employer for violating Minn.Stat. § 181.79 (2012). 683 N.W.2d at 772. Section 181.79 prohibits employers from deducting money an employee owes the company from the employee's wages. Minn.Stat. § 181.79, subd. 1. The employer argued that the employee was estopped from bringing his claim because he had breached contract and fiduciary duties during his employment. 683 N.W.2d at 775–77. We considered whether the common law defenses of waiver and estoppel were abrogated in light of exceptions contained within section 181.79 because none of these exceptions included waiver or estoppel. *Id.* at 775. We applied the canon of construction that statutes that abrogate the common law must do so expressly or by necessary implication. *Id.* at 776. Because section 181.79 did not clearly abrogate the common law defenses of waiver and estoppel, we concluded that the Legislature had not intended to abolish those defenses. *Id.*; *cf. Neuberger v. Hennepin Cnty. Workhouse,* 340 N.W.2d 330, 332 (Minn.1983) (concluding that despite the absence of an estoppel exception in the Workers' Compensation Act, an employer was estopped from asserting the statutory time bar because it had erroneously told the employee that his disability benefits would last indefinitely).

We applied this canon in *Brekke* even though wage-and-hour laws were unknown at common law, *see* 48B Am.Jur.2d *Labor and Labor Relations* § 2818 (2005), and are remedial in nature, *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945). Under the majority's reasoning in this case, our rule of construction relating to abrogation of the common law should not have resulted in relief for Brekke.

The court responds that the statute in *Brekke* did not create "an entire system of law in the way that the Implied Consent Law does." But we essentially applied this rule to the Workers' Compensation Act, *see Neuberger,* 340 N.W.2d at 332, which, as the treatise the majority cites notes, "provide[s] a complete system of law," *see* 3 Norman J. Singer & J.D.

---

**2.** Because this canon of construction serves as a presumption, we typically do not first consider whether the statute is ambiguous. *See, e.g., Dahlin v. Kroening,* 796 N.W.2d 503, 505 (Minn.2011) (considering whether a statute abrogates the common law without first deciding that it is ambiguous); *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 377–78 (Minn.1990) (same).

Shambie Singer, *Statutes and Statutory Construction* § 61:3, at 357 (7th ed.2008). In *Neuberger,* the employer denied Neuberger's workers' compensation claim and Neuberger went to discuss the denial with his supervisor. 340 N.W.2d at 331. The supervisor erroneously told Neuberger that he was equally well or better off on disability benefits and incorrectly indicated that disability benefits would last until he was 65. *Id.* Relying on these representations, Neuberger declined to file a workers' compensation claim until 4 years later when, at age 55, his disability benefits expired. *Id.* at 330–31. His employer responded that the 3–year, statutory time bar precluded his claim. *Id.* at 331 (citing Minn.Stat. § 176.151, subd. 1 (1982) (current version at Minn.Stat. § 176.151(a) (2012))). We disagreed, holding that the employer was estopped from asserting the time bar because the supervisor's misrepresentations caused Neuberger to file his claim late. *Id.* at 332. We reached this conclusion despite the fact that the Workers' Compensation Act is a complete system of law unknown to the common law and did not include an exception for estoppel, *see* Minn.Stat. § 176.151(c) (2012) (allowing claims after the statutory time bar when physical or mental incapacity prevent the employee from filing a claim). Although we did not expressly invoke the canon that statutes in derogation of the common law are strictly construed, the effect was the same: we applied a common law exception to a complete statutory regime unknown at common law.

The court concludes that section 169A.53 abrogates the common law by necessary implication because it limits the issues a petitioner may raise in an implied consent hearing. But in *Brekke,* the statute prohibiting wage deductions limited the defenses an employer could raise. 683 N.W.2d at 775. Despite these limits, we concluded that the Legislature had not

intended to abrogate the common law defenses of estoppel and waiver. *Id.* at 775–76. Similarly, in *Neuberger,* we applied estoppel to a time bar despite the fact that estoppel was not one of the exceptions provided in the statute. *See* Minn.Stat. § 176.151(c); *Neuberger,* 340 N.W.2d at 332. In *State v. Hage,* a criminal case, we acknowledged that the necessity defense is available in criminal cases involving driving under the influence. 595 N.W.2d 200 (Minn.1999). At the time, the statute at issue provided affirmative defenses for defendants who consumed alcohol after driving or were under the influence of prescribed drugs. Minn.Stat. § 169.121, subd. 2(d) (1998). The statute did not mention the necessity defense. *See* Minn. Stat. § 169.121 (1998). Under the court's reasoning today, the necessity defense should not have been available in *Hage,* yet we acknowledged that it was. *Hage,* 595 N.W.2d at 207. Unless the court is saying that *Hage* was wrongly decided and is reversing it *sub silentio,* the reasoning of *Hage* should lead to the conclusion that the necessity defense is available in driver's license revocation cases.

### III.

The court also contends that the necessity defense is unavailable because that defense only applies in criminal cases. But we have effectively applied the necessity defense in civil tort cases. *See, e.g., O'Leary v. Wangensteen,* 175 Minn. 368, 370–73, 221 N.W. 430, 431–32 (1928) (holding that the defendant was not liable for killing the plaintiff's dog because the dog was threatening the defendant's poultry); *Vincent v. Lake Erie Transp. Co.,* 109 Minn. 456, 458, 124 N.W. 221, 221 (1910) (concluding that it was not negligent for the defendant to leave his boat attached to a dock when a severe storm made it imprudent to leave the dock). Moreover, we have said that implied consent hearings

are quasi-criminal, and on that basis provided protections typically reserved for criminal defendants. *Friedman v. Comm'r of Pub. Safety,* 473 N.W.2d 828, 832, 835 (Minn.1991) (holding that criminal defendants have a limited right to confer with counsel before deciding whether to submit to alcohol screening).

In sum, the facts of this case require us to comply with our constitutional mandate to do justice and adhere to well-recognized principles of statutory construction. Because the court fails to do so, I respectfully dissent.[3]

WRIGHT, Justice (dissenting). I join in the dissent of Justice PAGE.

LILLEHAUG, Justice (dissenting). I join in the dissent of Justice PAGE.

---

3. I join the dissent of Justice Wright and the dissent of Justice Lillehaug.