JOHNSON, Judge
In March 2016, Brett Michael Wood was arrested for driving while impaired. Law-enforcement officers did not read Wood the implied-consent advisory. Instead, the officers sought and obtained a search warrant that authorized the taking of a sample of Wood's blood. The officers executed the search warrant over Wood's objection. The district court denied Wood's motion to suppress evidence of the result of the blood test, and a jury found him guilty at trial.
On appeal, Wood argues that the district court erred by denying his motion to suppress evidence on the ground that he had a statutory right to object to the blood test and thereby prevent the officers from executing the warrant. He relies on a statute that provides, in part, "If a person refuses to permit a test, then a test must not be given ...." Minn. Stat. § 169A.52, subd. 1 (2014). We conclude that the statute on which Wood relies does not apply in this case because the officers did not read Wood the implied-consent advisory but, rather, sought and obtained a search warrant that authorized the taking of a blood sample. Therefore, we affirm.
FACTS
Late in the evening of March 11, 2016, St. Joseph police officer Travis Manderscheid and reserve officer Gary Lauer stopped a vehicle driven by Wood after seeing that the vehicle's registration tabs had expired. When the officers asked Wood to identify himself, he gave the officers another person's name. Officer Manderscheid determined that the other person had an active arrest warrant and, thus, arrested Wood. During a search of Wood's person, the officers found papers bearing Wood's real name. Wood explained that he had given the officers the name of the *212 other person because he believed that he himself had an outstanding warrant.
Meanwhile, police officer Jason Luethmers and deputy sheriff Shawn Widmer arrived on the scene. During the officers' interactions with Wood, they observed that Wood was "very shaky, jittery, and fidgety"; was "sweating profusely"; and was speaking very rapidly. While searching him incident to his arrest, Deputy Widmer asked Wood to open his mouth, which revealed "heat bumps" on the back of Wood's tongue. Three officers later testified that heat bumps may be caused by smoking methamphetamine. Officer Manderscheid conducted field sobriety tests, which were inconclusive. Officer Manderscheid believed that Wood was under the influence of methamphetamine. Wood denied being under the influence of any controlled substance. Officer Manderscheid asked Wood whether he would voluntarily consent to a blood draw; Wood said that he would not do so.
Officer Luethmers sought and obtained a search warrant to authorize the taking of a blood sample. Meanwhile, Officers Manderscheid and Lauer transported Wood to a St. Cloud hospital. A St. Cloud police officer and a hospital security officer met the squad car at the entrance to the hospital, and Wood was taken to an examination room. Wood again stated that he was not consenting to a blood draw. He asked to speak with an attorney, but the officers did not allow him to do so. The officers physically restrained Wood, who was in handcuffs, so that a hospital technician could perform the blood draw. Wood's blood sample tested positive for amphetamine and methamphetamine.
The state promptly charged Wood with three offenses. One month later, the state amended the complaint to add a charge. As amended, the complaint alleged (1) first-degree driving while impaired (DWI) by operating a motor vehicle while under the influence of a controlled substance, in violation of Minn. Stat. § 169A.20, subd. 1(2) (2014) ; (2) first-degree DWI by operating a motor vehicle while one's body contains any amount of a schedule I or II controlled substance other than marijuana, in violation of Minn. Stat. § 169A. 20, subd. 1(7) (2014); (3) driving a motor vehicle after cancellation of a driver's license as inimical to public safety, in violation of Minn. Stat. § 171.24, subd. 5 (2014) ; and (4) giving a peace officer a false name of another person, in violation of Minn. Stat. § 609.506, subd. 2 (2014).
In June 2016, Wood moved to dismiss the complaint for lack of probable cause or, alternatively, to suppress the evidence of the result of the blood test. The district court held a contested hearing in August 2016. Officers Manderscheid, Widmer, and Luethmers testified for the state, and Wood testified on his own behalf. In a memorandum filed after the hearing, Wood argued, among other things, that law-enforcement officers violated his statutory right to not be subjected to a blood test after he refused to submit to chemical testing. In October 2016, the district court filed an order denying Wood's motion in its entirety. The district court reasoned, in part, that the officers were "under no obligation to read Defendant" the implied-consent advisory and that the officers "used lawful, well-established means to conduct a blood test pursuant to a signed warrant."
The case went to trial in June 2017. The jury found Wood guilty of all charges. In August 2017, the district court imposed concurrent sentences of 72 months of imprisonment on count 2 and 365 days of jail time on count 4. The district court dismissed count 1 and did not impose a sentence on count 3. Wood appeals.
*213 ISSUE
Were law-enforcement officers permitted to execute a search warrant that authorized the taking of a sample of appellant's blood after he was arrested for DWI in March 2016, even though he did not consent to the blood draw and objected to a blood test?
ANALYSIS
Wood argues that the district court erred by denying his motion to suppress evidence of the result of a blood test conducted after a non-consensual blood draw that was authorized by a search warrant. He does not contend that law-enforcement officers violated the Fourth Amendment to the United States Constitution. Indeed, the United States Supreme Court has held that a non-consensual blood draw is constitutionally permissible if it is performed pursuant to a valid search warrant. See Missouri v. McNeely , 569 U.S. 141, 148, 133 S.Ct. 1552, 1558, 185 L.Ed.2d 696 (2013) ; Schmerber v. California , 384 U.S. 757, 766-70, 86 S.Ct. 1826, 1833-36, 16 L.Ed.2d 908 (1966). Instead, Wood contends that law-enforcement officers violated a state statute that provides, in part, "If a person refuses to permit a test, then a test must not be given ...." Minn. Stat. § 169A.52, subd. 1 (2014). Wood contends that this statutory provision "limits the authority of police to execute a search warrant for a person's blood if the person refuses to permit the blood test." In response, the state contends that the statute does not apply in this case on the ground that the statute is part of the implied-consent law, which the officers did not invoke because they did not read Wood the implied-consent advisory. In the alternative, the state contends that the evidence of Wood's blood-test result should be admitted under an exception to the exclusionary rule.
To resolve the parties' disagreement over the meaning of the 2014 version of the particular statutory provision on which Wood relies-the first two clauses of subdivision 1 of section 169A.52-we must engage in statutory interpretation. "The first step in statutory interpretation is to determine whether the statute's language, on its face, is ambiguous." State v. Thonesavanh , 904 N.W.2d 432, 435 (Minn. 2017). " 'A statute is ambiguous only if it is subject to more than one reasonable interpretation.' " Id. (quoting 500, LLC v. City of Minneapolis , 837 N.W.2d 287, 290 (Minn. 2013) ). If a statute is unambiguous, "then we must apply the statute's plain meaning." State v. Nelson , 842 N.W.2d 433, 436 (Minn. 2014) (quotation omitted). But if a statute is ambiguous, "then we may apply the canons of construction to resolve the ambiguity." Thonesavanh , 904 N.W.2d at 435. This court applies a de novo standard of review to a district court's interpretation of a statute. Id.
A.
We begin by determining whether the statutory provision on which Wood relies is ambiguous or unambiguous with respect to the issue raised by Wood in this appeal. See id. An appellate court typically makes such a determination by considering the plain meaning of a statute based on "the common and ordinary meanings" of the words used in the statute. Id. at 436 ; see also State v. Eason , 906 N.W.2d 840, 842 (Minn. 2018) ; Nelson , 842 N.W.2d at 436 ; State v. Leathers , 799 N.W.2d 606, 608-09 (Minn. 2011) ; Occhino v. Grover , 640 N.W.2d 357, 359-60 (Minn. App. 2002), review denied (Minn. May 28, 2002). In some circumstances, it is necessary in determining whether a statute is ambiguous or unambiguous to consider other statutory provisions in surrounding sections or *214 in other related statutes. See, e.g. , STRIB IV, LLC v. County of Hennepin , 886 N.W.2d 821, 825 (Minn. 2016) ; State v. Schmid , 859 N.W.2d 816, 822-24 (Minn. 2015) ; Nelson v. Schlener , 859 N.W.2d 288, 293 (Minn. 2015) ; American Family Ins. Group v. Schroedl , 616 N.W.2d 273, 277 (Minn. 2000). In doing so, we " 'construe a statute as a whole and interpret its language to give effect to all of its provisions.' " State v. Prigge , 907 N.W.2d 635, 638 (Minn. 2018) (quoting State v. Riggs , 865 N.W.2d 679, 683 (Minn. 2015) ). In addition, it is sometimes necessary to consider the structure of the relevant statutes as a whole in order to understand the context in which the statute operates. See, e.g. , State v. S.A.M. , 891 N.W.2d 602, 604-08 (Minn. 2017) ; In re Dakota County , 866 N.W.2d 905, 911-13 (Minn. 2015) ; State v. Wenthe , 865 N.W.2d 293, 303 (Minn. 2015) ; Occhino , 640 N.W.2d at 359-61 ; In re Robledo , 611 N.W.2d 67, 69 (Minn. App. 2000). Structure and context may be important determinants of the meaning of a statute because "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." King v. Burwell , --- U.S. ----, 135 S.Ct. 2480, 2492, 192 L.Ed.2d 483 (2015) (quotation omitted). "Text may not be divorced from context." University of Texas Southwestern Med. Ctr. v. Nassar , 570 U.S. 338, 356, 133 S.Ct. 2517, 2530, 186 L.Ed.2d 503 (2013) ; see also Merit Mgmt. Group, LP v. FTI Consulting, Inc. , --- U.S. ----, 138 S.Ct. 883, 892-95, 200 L.Ed.2d 183 (2018).
In this case, the parties do not differ in their understanding of the plain meaning of the words used in the statutory provision on which Wood relies. They differ only as to whether the statutory provision applies if law-enforcement officers did not read the implied-consent advisory to a driver after arresting him or her for DWI. To determine whether the statutory provision applies or does not apply, we look to all of the state's statutes governing driving while impaired. In March 2016, those statutes were contained entirely within chapter 169A of the Minnesota Statutes, which is captioned "Driving While Impaired," and is also known as the "Minnesota Impaired Driving Code." Minn. Stat. § 169A.01, subd. 1 (2014). Chapter 169A is composed of five main parts: "General Provisions," Minn. Stat. §§ 169A.01 -.095; "Criminal Provisions," Minn. Stat. §§ 169A.20 -.37; "Procedural Provisions," Minn. Stat. §§ 169A.40 -.48; "Administrative Provisions," Minn. Stat. §§ 169A.50 -.63; and "Miscellaneous Provisions," Minn. Stat. §§ 169A.70 -.78.
The statutory provision on which Wood relies is in the fourth part of chapter 169A, which is captioned "Administrative Provisions." More specifically, the statutory provision on which Wood relies is within a subpart known as the "Implied Consent Law." The first section of the implied-consent law states, " Sections 169A.50 to 169A.53 may be cited as the Implied Consent Law." Minn. Stat. § 169A.50 (2014). Three substantive sections follow. First, "Section 169A.51 establishes implied-consent for intoxication testing and outlines requirements for such testing." Axelberg v. Commissioner of Pub. Safety , 848 N.W.2d 206, 213 (Minn. 2014) (Lillehaug, J., dissenting). Second, " Section 169A.52 establishes civil consequences, including license revocation, for test refusal or failure." Id. Third, " section 169A.53 allows the driver to seek [judicial] review" of the revocation of his or her driver's license. Id. The three substantive sections of the implied-consent law are primarily concerned with the civil *215 consequences of driving while impaired, not with criminal prosecutions.
The first substantive section of the implied-consent law provides for chemical testing to determine whether a driver is impaired. Minn. Stat. § 169A.51 (2014). It begins, "Any person who drives ... a motor vehicle within this state ... consents ... to a chemical test of that person's blood, breath, or urine for the purpose of determining the presence of alcohol, a controlled substance or its metabolite, or a hazardous substance." Id. , subd. 1(a). A chemical test "may be required of a person" if a law-enforcement officer has probable cause to believe that the person was driving while impaired and if the officer has arrested the person for that offense. Id. , subd. 1(b)(1) (emphasis added). "[A]t the time a test is requested," the officer must inform the arrested person "that Minnesota law requires the person to take a test" and "that refusal to take a test is a crime." Id. , subd. 2(a)(1), (2). The officer "may direct whether the test is of blood, breath, or urine." Id. , subd. 3.
Wood relies on the first two clauses of the first subdivision of section 169A.52, which is captioned "Test refusal or failure; license revocation." That subdivision provides, in relevant part, as follows:
If a person refuses to permit a test, then a test must not be given , but the peace officer shall report the refusal to the commissioner and the authority having responsibility for prosecution of impaired driving offenses for the jurisdiction in which the acts occurred. ... A refusal to submit to an alcohol concentration test does not constitute a violation of section 609.50 (obstructing legal process), unless the refusal was accompanied by force or violence or the threat of force or violence.
Minn. Stat. § 169A.52, subd. 1 (2014) (emphasis added). The second subdivision provides that if a person submits to chemical testing, "the results of that test must be reported to the commissioner [of public safety] and to the authority having responsibility for prosecution of impaired driving offenses for the jurisdiction in which the acts occurred." Id. , subd. 2. The next two subdivisions specify the consequences of a test refusal or a test failure: in either situation, "the commissioner shall revoke the person's license or permit to drive." Id. , subds. 3, 4. The remaining subdivisions of section 169A.52 concern the procedures for giving drivers notice of revocation, consequences for unlicensed drivers, and consequences for drivers licensed in other states. Id. , subds. 5-8. Notably, no provision in section 169A.52 has any effect on a criminal investigation or prosecution for DWI after a report is made to a prosecuting authority.
In contrast, the second part of chapter 169A, which is captioned "Criminal Provisions," sets forth the criminal offenses of driving while impaired, Minn. Stat. §§ 169A.20 -.27 (2014), and the criminal penalties that may be imposed, Minn. Stat. §§ 169A.275 -.276 (2014). In addition, the third part of chapter 169A, which is captioned "Procedural Provisions," contains several provisions that may apply in a criminal prosecution for DWI. Minn. Stat. §§ 169A.43 -.48 (2014). Among them is the following provision:
Upon the trial of any prosecution arising out of acts alleged to have been committed by any person arrested for violating section 169A.20 (driving while impaired) ..., the court may admit evidence of the presence or amount of alcohol in the person's blood, breath, or urine as shown by an analysis of those items . In addition, in a prosecution for a violation of section 169A.20, the court may admit evidence of the presence or amount in the person's blood, breath, or *216 urine, as shown by an analysis of those items, of:
(1) a controlled substance or its metabolite; or
(2) a hazardous substance .
Minn. Stat. § 169A.45, subd. 1 (2014) (emphasis added).
The interrelationships between these statutes make clear the meaning of the statutory provision on which Wood relies. The implied-consent law provides a means by which a person who has been arrested for DWI may be tested (or not tested) and thereafter denied driving privileges in an administrative process, with an opportunity for judicial review of a license revocation in a civil proceeding. This purpose may be served whether or not a driver submits to chemical testing. The implied-consent law facilitates a criminal prosecution by requiring an officer to report a person's test failure or test refusal to a prosecutor for possible prosecution. Minn. Stat. § 169A.52, subd. 2 (2014). But the implied-consent law does not contain any substantive or procedural provisions governing a criminal prosecution for DWI after such a report. Rather, other provisions in chapter 169A govern criminal prosecutions for DWI offenses. One of those provisions expressly permits a party to introduce the result of any breath, urine, or blood test into evidence at a criminal trial, without regard for whether the sample of bodily fluid was obtained pursuant to the implied-consent law. Minn. Stat. § 169A.45, subd. 1 (2014). Furthermore, nothing in the implied-consent law requires an officer to invoke the implied-consent law in any particular arrest. The implied-consent law states that an officer "may" require a test if he or she has probable cause to believe a person was driving while impaired and the person has been placed under arrest. Minn. Stat. § 169A.51, subd. 1(b)(1) (2014). The supreme court recently stated that this statutory language "affords officers ... discretion" in "choosing to read or not read the implied-consent advisory." State v. Hunn , 911 N.W.2d 816, 820 n.3 (Minn. 2018). Moreover, nothing in the implied-consent law prevents an officer from obtaining and executing a search warrant that will yield a sample of bodily fluid that may be tested. Accordingly, the structure of chapter 169A and the context in which the implied-consent law operates make clear that the statutory provision on which Wood relies applies only if the implied-consent law has been invoked, which occurs only if an officer reads the implied-consent advisory to a driver who has been arrested for DWI.
As stated above, "A statute is ambiguous only if it is subject to more than one reasonable interpretation." Thonesavanh , 904 N.W.2d at 435 (quotation omitted). Wood's interpretation of the statutory provision on which he relies is not a reasonable interpretation because it is inconsistent with the structure of chapter 169A and the context of the implied-consent law. Thus, the statutory provision on which Wood relies unambiguously did not prevent the officers from executing the search warrant that authorized the taking of a sample of Wood's blood in March 2016.
B.
Even if the statute were ambiguous with respect to the issue raised by Wood in this appeal, we would reach the same conclusion. If a statute is ambiguous, "then we may apply the canons of construction to resolve the ambiguity." Id. Neither party has suggested a canon of statutory construction that might apply. We believe that, if the statute is ambiguous, its meaning could be ascertained by referring to "the occasion and necessity for the law," "the circumstances under which *217 it was enacted," "the mischief to be remedied," and "the object to be attained," all of which may be understood by referring to "the former law." See Riggs , 865 N.W.2d at 683 n.4 ; see also State v. Scovel , 916 N.W.2d 550, 556-57 (Minn. 2018) ; Lietz v. Northern States Power Co. , 718 N.W.2d 865, 870 (Minn. 2006) ; Harris v. County of Hennepin , 679 N.W.2d 728, 732 (Minn. 2004). In this case, it is useful to review the evolution of the statutes governing driving while impaired, including the implied-consent law, as they relate to the issue raised in this appeal.
1.
The state's first statute governing driving while impaired was enacted in 1911. 1911 Minn. Laws ch. 365, § 21, at 503. It provided, "Whoever operates a motor-vehicle while in an intoxicated condition, shall be guilty of a misdemeanor." Id. (codified at Minn. Stat. § 2640 (1913) ). The statute was renumbered several times in subsequent decades. See 1917 Minn. Laws ch. 320, § 1, at 456 (codified at Minn. Stat. § 2640 (Supp. 1917) ); Minn. Stat. § 2714 (1923) (renumbering Minn. Stat. § 2640 (Supp. 1917) ); 1927 Minn. Laws ch. 412, § 2, at 565 (codified at Minn. Stat. § 2720-2, subd. (a) (1927) ); 1937 Minn. Laws ch. 464, § 26, at 743-44 (codified at Minn. Stat. § 2720-176 (Supp. 1938) ); 1941 Minn. Laws ch. 552, § 1, at 1173 (codified at Minn. Stat. § 169.12 (1941) ).
In 1957, the driving-while-intoxicated statute was amended to provide that, in a criminal prosecution, the district court "may admit evidence of the amount of alcohol in the person's blood taken voluntarily within two hours of the time of the offense as shown by a medical or chemical analysis of his breath, blood, urine or saliva." 1957 Minn. Laws ch. 297, § 1, at 354-55 (codified at Minn. Stat. § 169.121, subd. 2 (1957) ). But the driving-while-intoxicated statute, as amended, did not provide any procedures for the collection of a sample of bodily fluids. See Minn. Stat. § 169.121 (1957).
Thus, it appears that, after 1957, a prosecutor could introduce evidence of a chemical test of a driver's bodily fluid only if the driver had voluntarily consented to the taking of a sample.
2.
In 1961, the driving-while-intoxicated statute was augmented by a new statute that, in essence, was a predecessor of the current version of the implied-consent law. See 1961 Minn. Laws ch. 454, §§ 1-8, at 713-17 (codified at Minn. Stat. § 169.123, subds. 1-8 (1961) ). The first substantive provision stated:
Any person who drives or operates a motor vehicle upon the public highways of this state shall be deemed to have given consent ... to a chemical test of his blood, breath, saliva or urine for the purpose of determining the alcoholic content of his blood.
Minn. Stat. § 169.123, subd. 2 (1961). The new statute also provided that a chemical test "shall be administered" if a law-enforcement officer "has reasonable and probable grounds to believe that a person was driving or operating a motor vehicle while said person was under the influence of an alcoholic beverage" and the person has been arrested. Id. (emphasis added). The new statute further provided:
If a person under arrest refuses to permit chemical testing, none shall be given , but the commissioner of highways, upon the receipt of a certificate of the peace officer that he had reasonable and probable grounds to believe the arrested person had been driving or operating a motor vehicle upon the public highways while under the influence of intoxicating liquor, and that the person *218 had refused to permit the test, shall revoke his license ... for a period of six months.
Id. , subd. 4 (emphasis added). The new statute required an officer who requested a chemical test to inform the driver that his or her right to drive would be revoked for refusing to permit a test. Id. , subd. 2. The new statute also amended the existing driving-while-intoxicated statute with respect to the evidence that may be introduced in a criminal trial, by inserting the text underlined below:
Upon the trial of any prosecution arising out of acts alleged to have been committed by any person arrested for driving, operating, or in actual physical control of a motor vehicle while under the influence of an alcoholic beverage, the court may admit evidence of the amount of alcohol in the person's blood taken voluntarily or pursuant to section 169.123 within two hours of the time of the offense as shown by a medical or chemical analysis of his breath, blood, urine, or saliva.
Compare 1961 Minn. Laws ch. 454, § 9, at 717 (codified at Minn. Stat. § 169.121, subd. 2 (1961) ), with Minn. Stat. § 169.121, subd. 2 (1957).
Thus, after the 1961 amendment, an officer was required to invoke the statutory procedure for requesting a sample of bodily fluid after arresting a person for driving while intoxicated, and the driver was obligated by law to provide such a sample, else the driver's license would be revoked. Minn. Stat. § 169.123, subd. 2 (1961). In a subsequent criminal prosecution for driving while intoxicated, the prosecutor could introduce evidence of the result of a chemical test of a driver's bodily fluid only if the sample was obtained pursuant to the new statute or the driver voluntarily consented to the taking of a sample. Minn. Stat. § 169.121, subd. 2 (1961).
In 1980, the supreme court expressly endorsed this understanding of the statutes and explained that the purpose of section 169.121, subdivision 2, was "to protect ordinary drivers suspected of driving while under the influence from being subjected to nonconsensual removal of blood even in situations where the Constitution would allow the nonconsensual removal of blood." State v. Aguirre , 295 N.W.2d 79, 82 (Minn. 1980) (interpreting Minn. Stat. § 169.121, subd. 2 (1978)[1] ). The supreme court explained further that "if an officer merely has probable cause to arrest a driver for driving while under the influence ..., the statute does not give the officer any incentive to order a nonconsensual removal of the driver's blood because only blood removed voluntarily or in compliance with the provisions of the implied consent law will be admissible in any subsequent prosecution." Id. The supreme court reaffirmed this interpretation three years later, stating that in an ordinary prosecution for driving while intoxicated, the test result may be admitted into evidence at a criminal trial "only if the test was taken voluntarily or pursuant to the Implied Consent Law." State v. Speak , 339 N.W.2d 741, 744 (Minn. 1983) (interpreting Minn. Stat. § 169.121, subd. 2 (1982) ).
3.
In 1984, the legislature again amended the relevant statutes, apparently in response *219 to the supreme court's opinions in Aguirre and Speak . The statute governing the evidence that may be introduced in a criminal trial was amended by inserting and deleting language as follows:
Upon the trial of any prosecution arising out of acts alleged to have been committed by any person arrested for driving, operating, or being in physical control of a motor vehicle in violation of subdivision 1, the court may admit evidence of the amount of alcohol or a controlled substance in the person's blood, breath, or urine as shown by a n medical or chemicalanalysis of those items if the test is taken voluntarily or pursuant to section 169.123.
1984 Minn. Laws ch. 430, § 2, at 88, ch. 622, § 7, at 1543-44 (codified at Minn. Stat. § 169.121, subd. 2 (1984) ). At that time, the implied-consent law provided that a chemical test "may" be required of a person upon arrest for DWI. Minn. Stat. § 169.123, subd. 2 (1984) ; see also 1971 Minn. Laws ch. 893, § 3, at 1814 (amending statute by changing "shall" to "may").
Thus, as a consequence of the 1984 amendments, an officer was not required to request a sample of bodily fluid pursuant to the implied-consent law, see Minn. Stat. § 169.123, subd. 2 (1984), and a prosecutor was permitted to introduce evidence of the result of a chemical test that was obtained by means other than voluntary consent or the procedures of the implied-consent law, see Minn. Stat. § 169.121, subd. 2 (1984).
This court later recognized the consequences of the 1984 amendment to section 169.121, subdivision 2, by stating, in dictum , "The 1984 amendment by its terms eliminates any statutory mandate for compliance with implied-consent procedures as a condition of admissibility in the DWI prosecution." State v. Schauer , 501 N.W.2d 673, 676 (Minn. App. 1993). We also commented, "As now amended, the statute may give officers incentive in particular cases to order nonconsensual removal of blood without reading the advisory." Id. We also noted that both the supreme court and this court had stated in dicta that a prosecutor may introduce evidence of a blood-test result even if officers obtained such evidence without invoking the implied-consent law. Id. (citing Tyler v. Commissioner of Pub. Safety , 368 N.W.2d 275, 281 (Minn. 1985), and State v. Scott , 473 N.W.2d 375, 377 (Minn. App. 1991) ).
In light of the history of the state's statutes governing driving while intoxicated or impaired, the evolution of the implied-consent law, and this court's opinion in Schauer , any ambiguity in the statutes must be resolved in favor of the state's argument that the statutory provision on which Wood relies simply does not apply in this case. Wood's argument might have had merit under the statutes in existence between 1961 and 1984. But the relevant statutes were amended in 1984 in ways that foreclose his argument. The 1984 amendments were a part of the relevant statutes at the time of Wood's arrest for DWI in March 2016. Those statutes allowed officers to execute a search warrant for the nonconsensual taking of a sample of a person's blood after the person was arrested for DWI, and they allowed the state to introduce evidence of the result of a chemical test of the blood sample even if the sample was not obtained pursuant to the implied-consent law and even if the driver did not consent to the blood draw. See Minn. Stat. §§ 169A.45, subd. 1, 169A.51, subd. 1(b)(1) (2014).
C.
Before concluding, we address two other contentions in Wood's appellate briefs and oral argument.
*220 First, Wood contends that we should consider amendments to the statute arising from the 2017 legislative session. As a consequence of those amendments, the implied-consent law now provides that "blood and urine tests may be conducted only as provided in sections 169A.51 to 169A.53 and 171.177." Minn. Stat. § 169A.51, subd. 3 (2018). Section 171.177, which is captioned, "Revocation; pursuant to search warrant," extends implied-consent procedures to blood tests and urine tests that are conducted pursuant to search warrants. If a blood test or a urine test is "directed pursuant to a search warrant," the person subject to the search warrant "must be informed that refusal to submit to a blood or urine test is a crime." Minn. Stat. § 171.177, subd. 1 (2018). In addition, section 171.177 expressly prohibits non-consensual blood tests and urine tests: "If a person refuses to permit a blood or urine testas required by a search warrant and the provisions of this section, then a test must not be given," unless an officer has probable cause to believe that a person has violated the criminal-vehicular-homicide statutes. Id. , subd. 13(a) (emphasis added).
We acknowledge that these 2017 amendments relate to the issue that Wood has raised on appeal. But the 2017 amendments to the implied-consent law do not apply in this case because they did not become effective until July 1, 2017, approximately one and one-half years after Wood's offense. See 2017 Minn. Laws ch. 83, art. 2, § 10, at 366. Wood contends that we should view the 2017 amendments as mere clarifications of pre-existing statutes. But that contention is contrary to our caselaw, which recognizes that "[a]n amendment to a statute is presumed to have been intended to make some change in existing law." Schauer , 501 N.W.2d at 676. Although the presumption may be rebutted if the legislature intended only to clarify the law, see Braylock v. Jesson , 819 N.W.2d 585, 588 (Minn. 2012), the presumption is not rebutted here. The legislature made substantive changes in the implied-consent law in 2017. But we must apply the implied-consent law that was in effect in March 2016.
Second, Wood contends in his reply brief that a recent supreme court opinion supports his argument that officers may not forcibly obtain a blood sample if a driver refuses to consent to the taking of such a sample. In Hunn , an officer arrested a driver for DWI. 911 N.W.2d at 817. The officer did not read the implied-consent advisory but simply asked the driver to consent to a urine test, and the driver did so. Id. at 817-18. The issue on appeal was whether the driver had a limited right to counsel under the Minnesota Constitution that should have allowed him to speak with an attorney before responding to the officer's request. Id. at 818. The supreme court held that the driver did not have such a right because the limited right to counsel is triggered only if an officer reads the implied-consent advisory to a driver and thereby informs the driver of the consequences of submitting or refusing to submit to chemical testing. Id. at 820.
Wood relies on the italicized language in the following paragraph near the conclusion of the Hunn opinion:
Accordingly, we hold that the limited right to counsel recognized by Friedman [v. Commissioner of Public Safety, 473 N.W.2d 828 (1991) ] is triggered only when the implied-consent advisory is read. This rule of law does not mean that officers may force an individual to submit to chemical testing. Significantly, the statutes covering breath, blood, and urine tests both provide that, in most situations, if a person refuses testing, the test "must not be given." Minn. Stat. § 169A.52, subd. 1 (2016) ; Minn. Stat. § 171.177, subd. 13(a) (Supp. 2017).
*221 Id. at 820 (footnotes omitted) (emphasis added). Wood asserts that this excerpt from the Hunn opinion recognizes a right to refuse chemical testing even if an officer has not read the implied-consent advisory. We do not interpret the quoted language so expansively. As an initial matter, the italicized sentence appears to be dictum because it is not necessary to the resolution of the issue that was before the court. See State ex rel. Foster v. Naftalin , 246 Minn. 181, 74 N.W.2d 249, 266 (1956). More importantly, the facts of Hunn are different from the facts of this case. The officer in Hunn did not obtain a search warrant. 911 N.W.2d at 818. In the absence of a search warrant, Hunn could not have been "forced" to submit to a chemical test by the officer's simple request for his consent to a test. But the officer in this case obtained a search warrant authorizing the taking of a sample of Wood's blood. As described above, the implied-consent law did not prevent the officer from executing that warrant in March 2016. See supra parts A & B.
D.
For the reasons stated above, the statutory provision on which Wood relies-the first two clauses of subdivision 1 of section 169A.52-does not apply in this case arising from his arrest on March 11, 2016. Accordingly, officers were permitted to obtain and execute a search warrant that authorized the taking of a sample of Wood's blood. Therefore, the result of the test of Wood's blood was admissible in his criminal trial even though he did not consent to the blood draw and objected to chemical testing. See Minn. Stat. § 169A.45, subd. 1(1) (2014). In light of that conclusion, we need not consider the state's alternative argument asserting an exception to the exclusionary rule.
DECISION
The district court did not err by denying Wood's motion to suppress evidence of the result of the blood test.
Affirmed.

At that time, the statute provided, "Upon the trial of any prosecution arising out of acts alleged to have been committed by any person arrested for driving, operating, or being in physical control of a motor vehicle in violation of subdivision 1, the court may admit evidence of the amount of alcohol or a controlled substance in the person's blood, breath, or urine as shown by a medical or chemical analysis thereof, if the test is taken voluntarily or pursuant to section 169.123 ." Minn. Stat. § 169.121, subd. 2 (1978) (emphasis added).